ROGERS, J.
 

 Herman Taylor, Donald Rylich, George O’Day, and Ito Jacks, or Jacques, were convicted of the murder of Raymond Rizzo, and, from the conviction and sentence of death imposed thereunder appeal to this court.
 

 There appears to be no serious dispute as to the facts established by the record, although appellants contend that some of these facts were proved by illegal evidence, admitted over their objections, and we think it wiU be helpful to our discussion of the issues presented by the appeal to briefly set forth these facts. They are as follows, viz.:
 

 Ito Jacks, or Jacques, a New Orleans negro, then living in Chicago, invited the defendants Taylor, Rylich, and O’Day to accompany him
 
 *1015
 
 to New Orleans. The purpose of the intended Visit was to commit a robbery. On Wednesday, November 19, 1930, the defendants, accompanied by the mistress of Taylor, arrived in New Orleans in a stolen automobile. Jacks placed his companions, who were unfamiliar with New Orleans, in the home of Daisy Banks, a negro woman whom he knew. This was at No. 1442 St. Claude street. On Saturday night, November 22, 1930, Jacks borrowed an automobile from a friend for the purpose of robbing a bank. All the defendants, except Jacks, who gave his pistol to 'O’Day, armed themselves, and were driven in the automobile by Jacks, who was familiar with local conditions, to the corner of Iberville and Rocheblave streets, where the Rocheblave Market Branch of the Canal Bank & Trust Company is situated. After driving around the block, it was agreed among the defendants that Jacks was to continue to drive the automobile, Rylich was to take care of the police officer, who in full uniform was standing in front of the market across the street from the bank, while Taylor and O’Day were to enter the bank and rob it. Jacks parked the automobile on Iberville street about fifty feet from the bank. Rylich left the car and approached the police officer who was talking to an aged citizen. Taylor and O’Day entered the bank. Rylich walked up to the police officer and shot him down. A citizen picked up the policeman’s pistol and fired at Rylich, who ran towards the automobile driven by Jacks. Rylich returned the fire of the citizen as he retreated. While this was going on, Taylor and O’Day were inside the bank covering the bank’s employees with their pistols and demanding the bank’s money. Taylor fired a shot at the manager of the bank, narrowly missing him. Jacks hearing the shots started the automobile, and Rylich running towards the moving car jumped in. Before Taylor and O’Day came out of the bank, Jacks and Rylich had left the scene, eventually arriving at the premises No. 1442 St. Claude street. Taylor and O’Day ran from the bank, Taylor carrying its money in a brief case, firing as they ran at citizens, who had been attracted by the firing and who pursued them. The fugitives ran several blocks from the bank exchanging shots with citizens and police officers. During the pistol battle, Rizzo, a citizen who had joined in the pursuit, was fatally shot, and a policeman named Wilson was severely wounded. Taylor and O’Day jumped a fence pursued by police officers, and Taylor was caught in a' yard with his empty pistol in his possession. O’Day escaped from the scene. Just before they jumped the fence, Taylor shot Rizzo, who died later as a result of the wound. After .O’Day had effected his escape, he returned to the premises No. 1442 St. Claude street, where he met Rylich and Jacks. Rylich and Jacks wanted a division of the bank’s money O’Day had obtained from Taylor during their flight, but O’Day refused to make any division until Taylor was present. A few moments later the police arrived and arrested Rylich, O’Day, and Jacks. A considerable sum of the bank’s money was found in a yard, where Rylich, to whom it had been passed by O’Day as they were attempting to escape from the police, had dropped it. When Taylor was arrested, nearly $500 of the bank’s money was also found on his person.
 

 The transcript contains twenty-seven bills of exception. Four bills were reserved on behalf of Taylor; eight bills were reserved on behalf of Rylich; six bills were reserved on behalf of O’Day; and nine bills were reserved on behalf of Jacks. Each of the defendants filed motions for a new trial and in arrest of judgment. And each of them also filed an assignment of errors in this court.
 

 
 *1017
 
 In most instances the same legal points were reserved by all the defendants, so that it will be unnecessary to consider each bill of exception separately. All the bills, taken as a whole, present eight distinct questions of law. Those bills which involve the same legal points will be grouped and discussed as a whole under such grouping without reference to the particular bills.
 

 1. All the bills of exception numbered 1 reserved by each defendant are identical and refer to the overruling of their pleas to the jurisdiction of section C of the criminal district court for the parish of Orleans.
 

 Defendants’ pleas allege, in substance, that their arraignment, trial, conviction, and sentence in section O of the criminal district court for the parish of Orleans was illegal and a denial to them of due process of law, in violation of section 2, art. 1, of the State Constitution, and the Fourteenth Amendment of the Federal Constitution, for the reason that the indictment on which they were arraigned, tried, convicted, and sentenced was not allotted as made mandatory by section 86 of article 7 of the Constitution of Louisiana, section 9 of Act No. 114 of 1921 (Ex. Sess.) and by rule 6 of the Rules of the Criminal District court.
 

 On the trial of the pleas, the following facts were established, viz.:
 

 The indictment on which defendants are prosecuted charges that the murder was committed on November 22, 1930. On November 25, 1930, an affidavit was filed in the criminal district court, charging the four defendants with the shooting of Officer Alberts with intent to murder on November 22,1930. This affidavit was given the docket No. 56706, and was allotted on November 26, 1930, to section A of the criminal district court. An information was filed on this affidavit in section A of the criminal district court on December 11, 1930, and is still pending therein.
 

 On November 25,1930, an affidavit was also filed in the criminal district court charging the four defendants with the robbery of the bank on November 22, 1930. This affidavit was given the docket No. 56707, and was allotted on November 26, 1930nto section O of the criminal district court.
 

 On December 4,1930, the grand jury returned an indictment against the four defendants. This indictment contained two counts. The first count charged the defendants with the murder of Raymond Rizzo on November 22, 1930, and the second count charged the defendants with the robbery of the bank on the same date. This indictment was not allotted, but was given the No. 56707, the number of the affidavit for robbery, and was placed in section C of the criminal district court. The defendants were duly arraigned on the indictment, and pleaded not guilty. Later the defendant Ito Jacks withdrew his plea and moved to quash the indictment, on the ground that article 218 of the Code of Criminal Procedure, under which the indictment had been drawn, was unconstitutional. The motion was sustained by the trial judge, and on appeal to this court his judgment was affirmed. See State v. Jacques, 171 La. 994, 132 So. 657.
 

 After the judgment of this court became final, the grand jury reindicted the four defendants for the murder of Rizzo. This indictment was returned on February 19, 1931, given the docket No. 58067, and assigned but not allotted to section C of the criminal district court.
 

 On February 19, 1930, the grand jury also reindicted the four defendants for the robbery of the bank. This indictment was given the docket No. 5S068, and was also assigned
 
 *1019
 
 but not allotted to section C of tlie criminal district court.
 

 Section 86 of article 7 of the Constitution of 1921 provides that all prosecutions instituted in the criminal district court for the parish of Orleans shall be equally allotted by classes among the five judges of the court, and that each judge, or his successor, shall have exclusive control over any case allotted to him from its inception' to its final disposition. The constitutional article authorizes the judges of the criminal district court to provide by rule for the exercise of jurisdiction by any judge over any case previously allotted and also empowers the judges of said court to adopt all necessary rules not in conflict with law regulating the order of and the proceedings in the trial of all cases in said court.
 

 Act No. 114 of 1921 (Ex. Sess.), was adopted to organize the criminal district court as established by the Constitution of 1921. And section 9 of the act provides that all cases pending in the old court, transferred from the city criminal courts and subsequently filed shall be publicly and equally allotted by classes among the judges of the new court.
 

 Rule 6 of the criminal district court covers the allotment af cases therein. Section 1 provides that all casés entered on the general docket shall be publicly assigned daily by lot equally among the judges. Section 2 provides that the cases shall be divided into four classes and a separate allotment made of each class; that capital cases shall be in the first class; cases necessarily punishable at hard labor in the second class; cases not necessarily punishable at hard labor in the third class; and misdemeanors in the fourth class. The section provides that the allotment of cases shall be based upon the character of the crime charged; and then it further declares that “except as otherwise provided by these rules an information filed or an indictment found shall be allotted to the same section as the original affidavit whether the indictment or the information be for a greater or a lesser crime than that charged in the affidavit.”
 

 The defendants contend that the indictment for murder on which they were tried and convicted was never allotted according to its class as required by the constitutional and statutory provisions and the rules of court; and hence section C of the criminal district court was not vested with jurisdiction of the case.
 

 On the other hand, the state contends that the indictment for murder was properly allotted to section O of the criminal district court because ‘ it followed the allotment of the original affidavit that was filed charging the lesser crime of robbery, both crimes growing out of the same transaction.
 

 The affidavit bearing the No. 56707 charging the defendants with the robbery of the bank was filed and legally allotted to section O of the criminal district court. The matter was submitted to the grand jury, which returned an indictment containing two counts, one count charging the defendants with the murder of Rizzo and the other count charging the defendants with the robbery of the bank. This indictment, under the state’s interpretation of the law, followed the same allotment as the original affidavit No. 56707. Without questioning the allotment, the defendants pleaded thereto in section C of the criminal district court and one of them filed a motion to quash the indictment, which motion was sustained by the judge presiding over the said section. When this judgment was affirmed by this court and made executory in the court below, it Ijeeame necessary to charge the defendants in separate indictments with murder and with robbery. The indictment for murder was given the docket No. 5S067, and the indictment for robbery was given the
 
 *1021
 
 docket No. 58068. Both indictments, following the allotment of the previous indictment No. 56707, which had been quashed by the trial judge, were placed in section C of the Criminal District Court.
 

 Defendants argue that a case of murder, which is a crime of the first class under the rules of court, cannot follow the allotment of a case of robbery, which is a crime of the second class. That the rule of court providing that an information filed or an indictment found shall be allotted to the same section of the court as the original affidavit, whether the information or indictment be for a greater or lesser crime, can only apply to crimes of the same class. Otherwise the provision would be in conflict with the constitutional and statutory provisions and the rule itself.
 

 Section 86 of article 7 of the State Constitution and section 9 of Act No. 114 of 1921 (Ex. Sess.), provide for an equal allotment or assignment by classes of cases in the criminal district court, leaving the classification and method of allotment or assignment to be fixed by the rules of the court.
 

 The. state takes the position that there is nothing in the law, constitutional or statutory, or in the rules of court themselves, which prohibits the adoption of the particular rule of court that was followed in the allotment of this case; and that the rules of court were properly followed in making such allotment.
 

 There appears to be considerable merit in the position taken by the state, but we think defendants’ bills of exception may be disposed of on another ground.
 

 The criminal district court for the parish of Orleans is but one court, divided into five sections, each section being presided over by a separate judge. And undoubtedly that court had jurisdiction of the crime with which defendants are charged. Const. 1921, art. 7, § 83.
 

 There can be no question that there was an original allotment of the case, and hence no selection on the part of the state of the particular section of the court in which this case was to be tried. If the case was erroneously assigned to the wrong class
 
 or
 
 allotted to the wrong section of the court, such error was a mere irregularity in procedure, not affecting the jurisdiction of the trial judge to whom the ease was allotted or assigned; and the error worked no prejudice to the defendants.
 

 Conceding that the error in question might have been good ground for reallotment, we think defendants waived their right to object by their pleas thereto and under the motion to quash the indictment in case No. 56707 for murder and robbery, which was pending in section C of the criminal district court, which indictment was' actually quashed by the same judge who subsequently presided over the trial of the defendants for murder on the indictment No. 58067. See State v. Rose, 114 La. 1061, 38 So. 858; State v. O’Malley, 115 La. 1095, 40 So. 470; State v. Mischiro, 165 La. 705, 115 So. 909. The fact that the indictment in the present case was given a number on the docket different from the number borne by the indictment in the previous case is not important, in view of the fact that the crime of murder charged in both indictments is the same. State v. O’Malley, supra.
 

 The arguments of defendants that the indictment which was quashed was, in fact, no indictment at all, because of the unconstitutionality of the law under which it was drawn, „and hence the question of the legality of its allotment could not arise until it had been held by some trial judge to be invalid, is unsound. The indictment was regularly
 
 *1023
 
 presented by the grand jury, and its validity vel non could only have been determined in the first instance by one of the judges of the criminal district court to whose section it had been properly allotted or assigned. If the allotment or assignment was illegal or irregular, that question should have been first presented and determined, since the only judgment the trial judge could render in such a case on defendants’ objection would have been one ordering the reallotment or reassignment of the ease. Instead of exercising their right to attack the allotment or assignment of the indictment in limine, defendants chose to accept the forum and to level their attack solely at the legality of the indictment itself.
 

 By their appearance and pleas other than to except to the allotment or assignment or their case, defendants clearly waived their right to urge the want of a regular allotment or assignment.
 

 2. The defendants Taylor and Rylich reserved bills of exception to the overruling by the trial judge of a motion for a continuance filed by their attorneys, who were appointed by the court to defend them.
 

 The basis of the motion is that, because of the quarantine against smallpox placed upon the parish prison, where the defendants were incarcerated, defendants’ attorneys were prevented from consulting with them and were not afforded a sufficient time in which to prepare the case.
 

 The statement per curiam shows that eight days prior to the trial of the case the district attorney informed counsel that he would have the defendants Taylor and Rylich brought to his' office for consultation at any time, and as many times as they desired, that defendants would be permitted to consult, with their attorneys out of the presence of any one, and that the facilities afforded them for consultation would be better than those that could be had in the parish prison. The • trial judge declares that, in his opinion, defendants were afforded ample time to prepare their case for trial, and for that reason he overruled the motion for a continuance.
 

 The granting or refusing of a continuance is within the sound discretion of the trial judge, and his ruling will not be disturbed unless there has been an arbitrary or unreasonable abuse of the discretion vested in him. Code Cr. Proc. art. 320; State v. Flores, 169 La. 22, 124 So. 132; State v. Gardner, 169 La. 1011, 126 So. 510; State v. Dundas, 168 La. 95, 121 So. 586; State v. Scruggs, 165 La. 842, 116 So. 206.
 

 We are not prepared to say that the trial judge abused his discretion in refusing the continuance applied for. Defendants made no attempt to show by testimony that they suffered any injury by lack of preparation on the part of their attorneys; and we are not informed in what .respect they could have interposed a more vigorous defense had the motion for a continuance been granted. Moreover,-they were ably represented by then-attorneys, who appear to have invoked every technical defense that legal ingenuity could suggest.
 

 3. The defendants Rylich, O’Day, and Jacks filed motions for a severance from their 'codefendants. The motions were denied by the trial judge. Rylich and O’Day reserved bills of exception to the ruling so far only as it denied them a severance from their codefendant Taylor; and Jacks reserved bills of exception to the ruling so far only as it denied him a severance from his codefendants Tay-Jor and O’Day.
 

 With the exception of the necessary substitutions of the names of the several defendants, the averments of the motions for a severance are substantially the same.
 

 
 *1025
 
 On the hearing of a motion to quash filed by the defendants Rylich and Jacks, a statement of facts of what the district attorney expected to prove on the trial of the case was filed in evidence by the defendants. .
 

 Each of the applicants for a severance, in his application, referred to the statement of facts of the district attorney, and also annexed thereto a copy of an alleged confession of their codefendant Taylor. Jacks, in addition, annexed to his application a copy of an alleged confession of his codefendant O’Day. The copies of the alleged confessions were furnished defendants by the district attorney.
 

 All the applicants for a severance alleged •that their defenses were antagonistic to that of their codefendant Taylor. Jacks also alleged that his defense was antagonistic to that of his codefendant O’Day. And counsel for Jacks argue that, if his application for a severance from Taylor was well founded, then his application for a severance from O’Day was also well founded.
 

 Rylich and Jacks allege in their applications as a cause of severance from Taylor that, as shown by the statement of facts furnished them by the district attorney, they had left the scene of the robbery in an automobile before the crime was completed, and that they were not present at the alleged killing of Rizzo; that the alleged confession of Taylor discloses that he was at or near the place where Rizzo was fatally shot, and that after he left the bank he fired on his pursuers.
 

 Jacks alleges in his application for a severance from O’Day that their defenses are antagonistic, but he does not set forth of what the antagonism consists. Jacks avers that the alleged confession of O’Day contained a recital of facts occurring after he had abandoned the conspiracy to rob the bank and had left the scene, and for which facts he was in no wise responsible.
 

 O’Day alleges, in his application for a severance from Taylor that at the time of the killing of Rizzo, he had separated from Taylor, that he was not present at the fatal shooting of Rizzo, and that, so far as he was concerned, the conspiracy to rob the bank was at an end.
 

 All the applicants for a severance alleged that the acts of Taylor were his individual acts, and that they were not responsible for the killing of Rizzo, if he was killed by Taylor. They also alleged that the confession of their codefendants would prejudice them before the jury.
 

 The trial judge denied the motions for a severance for the following reasons, viz.:
 

 “There is no evidence in this record to show that any confessions were offered. Statements were made by all the defendants admitting that each had entered into a conspiracy with the others to rob the branch bank of the Canal Bank
 
 &
 
 Trust Company; that they were all armed with revolvers; that Ito Jacks, or ‘Jacques’ had given a revolver to one of the other defendants; that during the course of the robbery and while fleeing from the scene some shooting took place. None of the defendants admitted that he had done the shooting, nor did he charge his co-defendants with doing the shooting, but at all times maintained that they had not killed Raymond Rizzo.
 

 “As there was nothing in the motion for a severance to show that a confession had been made by either of the defendants implicating the others, I overruled the motion for a sevr erance.
 

 “It will be noted that in the motion for a severance, and the evidence introduced on the trial, that admissions were made, but no con
 
 *1027
 
 fessions were obtained, and that the defenses of the accused were not antagonistic. As a matter of fact, it was absolutely impossible for one defendant to stand trial alone, as under the evidence and under the charge it necessarily follows that if anyone of the defendants fired the fatal shot before the conspiracy was at an end, which the evidence showed, the others were necessarily guilty.”
 

 As will be seen by the statement per curiam, the trial judge says that the defenses were not antagonistic; that there was no attempt on the part of any one of the defendants to shift the responsibility for the killing of Rizzo on; any other defendant. We find nothing in the record to refute this statement. And the applicants for a severance could be and were amply protected against any ill effects, if any, of the admissions or confessions of their co-defendants by the trial judge’s instructions to the jury. See State v. Birbiglia, 149 La. 4, 88 So. 533; State v. Murphy, 154 La. 190, 97 So. 397; State v. Lamotte, 168 La. 837, 123 So. 591. We do not find any merit in the bills.
 

 4. The defendants Rylich and Jacks filed separate motions to quash the indictment. The motions are based on a statement of facts made by the district attorney and filed in court on the hearing of the motion of defendant Jacks to quash the original indictment containing a count for robbery and a count for murder; and'they allege, substantially, that the grand jury had no legal evidence on which to return the indictment herein, because, from the statement of the district attorney, there* was no evidence to show that these defendants had entered into any conspiracy with their codefendants to commit the crime of murder.
 

 On the hearing of the motions, defendants offered the statement of facts made by the district attorney, and also placed him on the stand as a witness. After identifying the statement as containing the facts he expected to prove on the trial of the case, the district attorney was asked by defendants’ counsel if these were the only facts placed before the grand jury. The court refused to permit any inquiry to be made as to what took place in the grand jury room. A bill of exception was reserved to this ruling, and bills of exception were also reserved to the overruling of the motions to quash.
 

 The trial judge says, in his statement attached to the bill of exception reserved by Jacks, that the motion to quash based on the fact that at the time of the killing of Rizzo, although Jacks had entered into a conspiracy with the other defendants, he was not present and was therefore not responsible, is without merit, that the admissions showed that the conspiracy was not at an end at the time Rizzo was killed, but that Jacks had gone to the house where the conspiracy was entered into, for the purpose of obtaining a part of the plunder secured in the robbery, and was arrested after the homicide in the presence of his fellow conspirators, before he had time to secure his share of the loot, at the very house which they had left before committing the robbery and.murder and in which they had agreed to assemble after the robbery and to divide the spoils. And the trial judge in his statement annexed to the bill of exception reserved by Rylich sets forth that the bill is covered
 
 by¡
 
 his per curiam annexed to the bill of exception taken by Jacks.
 

 The legal questions presented by the motions to quash and the bills of exception reserved to their denial are the same questions involved in the bills of exception taken to the refusal of the trial judge to give certain special charges submitted by the defendants Rylich, O’Day, and Jacks, and will be disposed of in our consideration of these bills.
 

 
 *1029
 
 The ruling of the trial judge in refusing to permit any inquiry to be made into what took place in the grand jury room was clearly correct.
 

 It is a general and well-settled rule that testimony concerning the grand jury must come from others than the members of the jury, and that the rule is equally applicable to the prosecuting officers of the state. State v. Britton, 131 La. 877, 60 So. 379. And a finding of the grand jury is not a verdict or judgment, but amounts at most to an accusation, and there is no law which fixes the nature or quantum of evidence on which grand juries must rest their conclusions. Id.
 

 5. The defendants Rylieh and Jacks reserved bills of exception to the overruling by the trial judge of their objections to the admission of any testimony against them as to what occurred after they had fled from the scene of the robbery, as being without their knowledge or consent, and as not forming part of the conspiracy to commit the robbery.
 

 The legal questions presented under the bills are the same questions as are presented under the bills reserved to the overruling of these defendants’ motions to quash and the bills reserved by these defendants and their codefendant O’Day to the refusal of the trial judge to give the special charges submitted by them. We will dispose of the questions in our discussion of the last-mentioned bills.
 

 6. Each of the defendants reserved a bill of exception to the action of the trial judge in admitting over his objection what the defendant calls a “confession” and what the state terms an “admission.” All the bills are substantially the same. They contain a summary of all the testimony adduced in the case, and attached to each bill is a copy of the testimony, which is made a part of the bill.
 

 On the trial of the case, the state placed on the stand J. Bernard Cocke, assistant district attorney for the parish of Orleans, and sought to obtain from him a statement made by each of the defendants in his presence and in the presence of others. All the defendants objected to the admission of the statements, on the ground that they were not freely and voluntarily made, but were obtained through fear and intimidation. The trial judge, in his statement per curiam, sets forth that the statements were not confessions, but were admissions ; none of the defendants admitting that he or any of his codefendants killed Rizzo: The trial judge also states that, as shown by the evidence, the admissions were voluntarily made by the defendants, and that no threats were made, no violence used, and no inducements offered to obtain the admissions, which were voluntarily made by the defendants.
 

 The trial judge, in admitting the statements, expressly limited the effect of each statement to the defendant who had made it, specifically instructing the jury that the statement of one defendant could not be considered as evidence against the other defendants.
 

 ' The statements in question were made by the defendants under the following circumstances, viz.:
 

 Taylor was the first defendant arrested. He was taken into custody at the scene of the fatal shooting of Rizzo, and brought by the arresting officers to the Fourth Precinct Police Station. Taylor was then taken by the chief of police, accompanied by police officers and Mr. Cocke, the assistant district attorney, to the home of Daisy Banks at No. 1442 St. Claude street. When the police arrived at the house, they encountered some delay in entering. When they finally entered the premises, they heard a noise as if some one was running upstairs. The chief of, police looked
 
 *1031
 
 out'of a window and saw á man entering the house'from a window that opened on an alleyway downstairs and he fired a shot into the alleyway. The officers then searched the premises, and in a clothes closet downstairs found the defendant Jacks hiding. He was unarmed and made no resistance when placed under arrest. Jacks was taken out of the house to the street corner wherei Taylor was in the custody of'some policemen. Reinforcements were sent for, and the block was quickly surrounded by armed police officers. O’Day was then seen to come out on the roof of the house. • He came down slowly towards the end of the roof towards the street. He stopped ori his way down, and the police officers called to him to come on down. He had something white in his hand, at the time. As he resumed his'-journey, he put his hands down towards the roof, and the assistant district attorney shouted to him to come on down with his hands up, at the same time telling the officers to see that he kept his hands up, and that if he put them down to shoot him. O’Day made a few steps more in a stooping position, when the police officers fired on him. He then fell on the roof, and two police officers went out on the roof and brought him into the house through the window, and then to the street comer where Taylor was being held in custody.- Shortly afterwards, the chief of police came out from another doorway with Rylich, who was found hiding in some shrubbery in a nearby yard.
 

 The four defendants were then placed by the police in automobiles and carried to the office of the superintendent of police, where they were questioned separately by the assistant district attorney. This was about ■2 o’clock in the morning.
 

 The evidence affirmatively shows that ho violence was-used, no threats made, and no inducements held out to the defendants to make the statements testified to by the assistant district attorney. None of the defendants took the witness stand to make any claim to the contrary. Their position is that the statements Were obtained from them through fear, duress, and intimidation. But they do not support their position with their own testimony, making any such claim. They rely entirely on the circumstances under which they were arrested — the number of police officers taking part, the firing of shots, and the wounding of O’Day — and under which their respective statements were obtained. They contend that under Act No 20 of 1928 and article 77 of the Code of Criminal Procedure they should have been taken immediately after their arrest to the hearest police precinct station and not to police headquarters. They aver that when.they arrived at police headquarters they were surrounded by a number of people, among whom were mimy police officers, and that the atmosphere of the place was heavy with hostility.
 

 Act No. 20 of 1928, according to its title, was adopted to define the authority of the district judges throughout the state .and the recorders of the city of New Orleans to grant bail or to parole or release in such cases, and providing a penalty for the violation of the act. The statutory provision, as well as article 77 of the Code of Criminal Procedure, referred to by defendants providing for the carrying of a person under arrest to the nearest police station to be then and there booked, the record whereof is always to be kept open to public inspection, were apparently enacted to facilitate and to protect persons arrested in obtaining their release on bail or on parole. It may be that the officers who arrested the defendants were amenable to the law, but we fail to see what bearing the statute or the codal article have on the present inquiry.
 

 
 *1033
 
 The desperate manner in which the defendants had committed the series of crimes for which they were being sought justified the number of police engaged in. their pursuit and the use of force and firearms in effecting their arrest. The statements of the defendants were not made in the presence of a mob composed of citizens and policemen, but were made in the private office of the chief of police in the presence only of the assistant district attorney, the chief of police, and three or four police officers.
 

 The wound of O’Day, to which reference is made in defendants’ argument on their bills, was a superficial one. It was only a flesh wound in the shoulder. O’Day made no complaint of being wounded at the time of his arrest, and it was only after he had been in the office of the chief of police a short while that he began shrugging his shoulder. The assistant district attorney asked what was the matter, and he thereupon took off his shirt exhibiting a “little nick” in his shoulder.
 

 After O’Day had made his statement, he was taken to the vicinity of the murder, where he pointed out the yard of the house where he was lying, and there were found in the yard a pistol and five packages of pennies, which were stolen from the bank. Another pistol was found under some wood where O’Day claimed he had thrown it.
 

 The record shows that $492 of the bank’s money was found on the person of Taylor, and that he stated he had dropped a considerable sum of money in his flight. The record also shows that, at the point where Rylieh told the chief of police he would find some money, the witness found $1,068 wrapped in an old newspaper. Some of the bills were in packages, secured by bands on which was stamped "Canal Bank and Trust Co.”
 

 We do not think that .the defendants were put in fear by the manner of their arrest or by the conduct on the part of the officers who effected their arrest and received their statements. In our view, Rylich and Jacks, unaware of .their legal responsibility in the murder of Rizzo, freely talked of the robbery, describing their flight from the scene and the. incidents leading to their arrest. Taylor and O’Day also talked • freely concerning their connection with the affair. B.ut none of the defendants admitted that he shot Rizzo..
 

 Therefore, as we find that the statements were freely and voluntarily .made, they were admissible' as evidence, Whether they be considered as confessions or merely as admissions of inculpatory facts. Seé State v. Rini, 151 La. 163, 91 So. 664.
 

 7. The defendants O’Day, Rylich, and Jhcks reserved bills of exception to the refusal of the trial judge to give certain requested spe-cial charges. The special charges are Nos. 11, 12, and 13. Charge No. 11 was asked on behalf of O’Day; charges Nos. 11 and 13 were asked on behalf of Rylich, and charges Nos. 11, 12, and 13 were asked on behalf of Jacks.
 

 Special charge No. 11, which was requested on behalf of the three defendants, O’Day, Rylich, and Jacks, is in the following words,, viz.:
 

 “A person who has joined in a conspiracy to commit a robbery is not responsible for a homicide committed by one of his fellow, conspirators to avoid arrest, after the robbery has been accomplished, and not in the presence of the said person, and after the said person has fled from the scene of the robbery.”
 

 Special charge No. 13, which was asked on behalf of the defendant Jacks, reads as follows, viz.: ■ . ■.
 

 
 *1035
 
 “If the evidence does show beyond reasonable doubt that the shooting and killing of •the defendant Rizzo was by one of the defendants, but if the evidence does not show beyond reasonable doubt that the shooting and killing of the deceased Rizzo occurred while the robbery of the bank was being made, but does show that the said shooting and killing of said Rizzo was after the robbery was over, and that the defendant Jacks was not present at the time of the said shooting or near the place where the shooting occurred and had fled from the scene of the robbery before the robbery was completed, and before the said shooting and knew nothing of the said shooting, then I charge you that you should not convict the said defendant Jacks of the charge in the indictment or of any crime included in it.”
 

 Special charge No. 13, which was asked on behalf of the defendant Rylich, is in the same words, except that the name “Rylich” is substituted for the name “Jacks.”
 

 Special charge No. 12, which was submitted on behalf of the defendant Jacks alone, reads as follows, viz.:
 

 “If you find from the evidence beyond a reasonable doubt that on the night of Saturday, November 22nd., 1930, an Essex automobile driven by Ito Jacks, defendant herein and containing Herman Taylor, Donald Rylich and George O’Day, defendants herein, drove in Iberville Street to the corner of Roeheblave Street for the purpose of robbing the Rocheblave Market Branch of the Canal Bank and Trust Company, as previously agreed to by them; that on approaching the Bank, Donald Rylich, Herman Taylor and George O’Day left the automobile and walked in the direction of the bank; that the automobile driven by Ito Jacks continued on past the bank and parked across the street from the bank about 50 feet from the bank; that George O’Day and Herman Taylor, with revolvers drawn, went into the bank; that Donald Rylich walked across Rocheblave Street to where Police Officer Alberts in full uniform, was talking to an aged citizen; that Donald Rylich drawing a revolver shot the officer down; that a citizen picked up Officer Alberts’ revolver and fired upon Donald Rylich, while he, Donald Rylich, was in the act of going to the waiting automobile driven by Ito Jacks; that Donald Rylich returned the fire of the citizeh who had picked up Officer Alberts’ pistol; that while this firing was going on outside of the bank, Ito Jacks was in the automobile; that Donald Rylich went to the automobile and got into the same; that Ito Jacks started the car and with Donald Rylich in the automobile drove in Iberville Street, turned into Tonti Street to St. Louis Street into Rampart and thence into Orleans Street where they left the automobile; that they later went to the premises No. 1442 St. Claude Street, the living quarters of Donald Rylich, Herman Taylor and George O’Day, and where they were later arrested from; that George O’Day and Herman Taylor, after having robbed the teller of the said bank of several thousands of dollars, with pistols, left the bank; that citizens immediately took up the chase of said George O’Day and said Herman Taylor; that said Herman Taylor and said George O’Day, with the funds of the bank in their possession ran into Iberville Street, firing several shots at their pursuers ; that when the said George O’Day and the said Herman Taylor reached the corner of Tonti Street, they turned into Tonti Street and ran to Bienville Street where on Bienville Street between Miro and Galvez, either one or both of them engaged, in a pistol battle with police officers and citizens; that in the said pistol battle the said Herman Tay
 
 *1037
 
 lor shot the decedent, Raymond Rizzo, from which wounds, he, the said Raymond Rizzo, later died.
 

 “That the said Herman Taylor was arrested at the scene of the shooting of Raymond Rizzo; that the said George O’Day was later arrested at the premises No. 1442 St. Claude Street.
 

 “Then I charge you if you do so find that you should acquit the defendant, Ito Jacks.”
 

 The legal proposition presented by the requested charges is: Are the defendants Rylich, Jacks, and O’Day guilty of the murder of Rizzo, who was fatally shot by the defendant Taylor as he was fleeing from the scene of the robbery, with the fruits thereof and before their division, Rylich and Jacks not being present at or near the place the shooting occurred, but being some distance away in an automobile fleeing from the scene of the robbery, and the defendant O’Day being at or near the place of the murder?
 

 The state contends that the object of the conspiracy was not only to feloniously, violently, and forcibly rob the bank by the use of firearms, even to the extent of taking human life if necessary to accomplish the successful robbery, but that the conspirators also contemplated the forcible and violent resisting of any attempt to apprehend them or to deprive them of the possession of the spoils, even to the extent of taking human life if necessary, and that, until the stolen money was actually divided among the conspirators, the conspiracy was still in force and effect, and that the act of the defendant Taylor in murdering Rizzo was, in law, the act of all the defendants.
 

 The requested charges were refused by the trial judge because, as shown by his statements per curiam, they were not the law and were not responsive to the facts established in the case; that the charges are practically the same and relate to the responsibility of the conspirators; that the law with reference to conspiracy and the responsibility of conspirators was covered by the general charge, to which charge no bill of exceptions was reserved; that the requested charges were not wholly correct or wholly pertinent, and would have required qualification and a great deal of explanation to meet the evidence in the case; and, furthermore, that, at the time the bills were reserved to the refusal to give the special charges, the exceptions were not accompanied by any statement nor was any error pointed out or suggested by defendants as required by article 391 of the Code of Criminal Procedure.
 

 In response to a motion therefor, the entire charge of the trial judge was reduced to writing and was duly filed in the record. The charge was a most exhaustive one, and we quote those portions of it that are pertinent to the issues presented by the bills of exception now under discussion, namely:
 

 “I further charge you that the general rule is that, when several persons conspire or combine together to commit an unlawful act, and a homicide results, each is criminally responsible for the act of his associates or confederates if committed in furtherance, or in prosecution of the common design for which they combined. And the rule is the same in such cases whether or not the person sought to be held was present at the time of the homicide, and whether he or a co-conspirator did the deed. And it is not affected by the fact that homicide was not the result intended, or within the contemplation of the parties as a part of the original design.
 

 “No person can be held guilty of homicide unless the act is either actually or constructively his; and it cannot be his in either sense, unless committed by his own hand or
 
 *1039
 
 by some one acting in concert with him, or in furtherance of a common object or purpose, as distinguished from someone acting independently or in opposition to him. The rule for criminal responsibility for acts of others done in prosecution of an unlawful object, is subject to the limitation that the particular act of one of a party, for which the associates or confederates are to be held liable, must have been shown to have been done for the furtherance, or in the prosecution of the common object and design, for which they are combined together. There can be no criminal responsibility on the part of a conspirator for a death resulting from something not fairly within the common enterprise. The true test as to the responsibility of one person for a homicide committed by another is: did the parties act together; and was the act done in furtherance of a common purpose in which their minds had agreed. So, where a homicide is committed by one or more of a body who have unlawfully associated, from causes having no connection with the common object, the responsibility for such homicide attaches exclusively to its actual perpetrators. And where an unlawful act, agreed to be done by conspirators, is not of a dangerous or a homicidal character, and its accomplishment does not necessarily or probably require the use of force and violence which may result in the unlawful taking of human life, criminal responsibility for such taking of life by one of them will not attach to another from the mere fact of his having been a party to the agreement. But, where several persons confederate together to commit a crime of a nature or under such circumstances as will-when tested by human experience, probably result in the taking of human life if such necessity should arise to thwart them in the execution of their unlawful plans, it must be presuméd that'they all understood the consequences which might be reasonably expected to flow from carrying into effect their unlawful combination, and to have assented to the taking of human life if necessary to accomplish such unlawful act. And, if death happens in the prosecution of such common design or object, all are alike guilty of homicide. If ,the unlawful act agreed to be done is dangerous or homicidal in its character, or if its accomplishment will necessarily or probably require the use of force and violence which may result in the taking of human life unlawfully, every party to such agreement will be held criminally liable for whatever one of the co-conspirators may do in furtherance of the common design, whether he is present or not.
 

 “When two or more persons enter upon a common enterprise or adventure which contemplates the commission of a criminal offense, each is a conspirator, and his criminal responsibility extends, not alone to the enterprise, adventure or encounter in which the conspirators are engaged, but takes in the proximate, natural and logical consequences of such adventure; and, if such conspiracy or community of purpose embraces the contingency that a deadly encounter ensue, with the common intent, expressed or implied, to encourage aid or assist, even to the taking of human life should the exigencies of the encounter lead to that result, the act of one taking life is likewise the act of all. When a conspiracy is entered into to do an unlawful act, all persons who engage therein are responsible for all that is done in pursuance thereof by any of their conspirators until the object for which the conspiracy was entered into is fully accomplished. This responsibility is not confined to the accomplishment of the common design for which the conspiracy was entered into, but it extends to and includes collateral acts incident and growing out of the common design. Thus, when a
 
 *1041
 
 conspiracy embraces not merely a series of unlawful acts, but also extends to a division of tbe fruits and proceeds of such acts among the co-conspirators, anything said or done by them although after the commission of the unlawful acts, but before a division or disposition of the proceeds of such acts, is binding against all of the other conspirators.
 

 “I charge you that in order to constitute an effective abandonment of a criminal enterprise, both as a matter of law and of common sense, that there must be some appreciable interval between the alleged abandonment and the act from responsibility for which escape is sought. It must be possible for a jury to say that the accused had wholly and effectively detached himself from the criminal enterprise before the act with which he is charged is in the process of consummation or has become so inevitable that it cannot reasonably be stayed. The process of detachment must be such as to show not only a determination upon the part of the accused to go no farther but also such as to give his co-conspirators a reasonable opportunity, if they desire, to follow his example and refrain from further action before the act in question is committed. A conspirator cannot escape responsibility for an act which is the natural result of a criminal scheme which he has helped to devise and carry forward because as the result either of fear or even of a better motive he concludes to run away at the very instant when the act in question is about to be committed and when the transaction which immediately begets it has actually been commenced. * * *
 

 “I charge you that if the evidence should satisfy you beyond a reasonable doubt, that a conspiracy existed between the defendants, or any two or more of them, not only to rob the officers and employees of the Roeheblave Market Branch of the Canal Bank and Trust Company, but that the conspiracy, if any such existed, also included and extended to a division of the funds, obtained from the said bank in the said robbery, that any act or declaration of any one of the conspirators performed or done after the said- bank had been robbed, but before a disposition or division of the proceeds of said robbery had taken place between the said conspirators, is binding on all of the said conspirators and the act .of one is the act of all; therefore, I charge you, that if the evidence should satisfy you beyond a reasonable doubt, that a conspiracy existed between the defendants or any two or more of them, not only to rob the officers and employees of the Roeheblave Market Branch of the Canal Bank and Trust Company, but that the conspiracy, if any existed, also included and extended to a division of the funds obtained from the said bank in the said robbery and that one of the conspirators killed the deceased Raymond Rizzo while attempting to escape and to prevent apprehension after having robbed said bank and before a disposition or division of the funds obtained from said bank in said robbery had been made between him and his fellow conspirators, all who have joined in said conspiracy are guilty in the eyes of the law for the acts of either fellow conspirator, and you should so find them.
 

 “If, however, the evidence should satisfy you beyond a reasonable doubt, that a conspiracy existed between the defendants, or any two of them, not only to rob the officers and employees of the Roeheblave Market Branch of the Canal Bank and Trust Company, and that the conspiracy, if any existed, also included and extended to a division of the funds obtained from the said bank in the said robbery, and that one of the conspirators killed the deceased Raymond Rizzo while attempting to escape and to prevent apprehension after having robbed the said bank, but
 
 *1043
 
 that the said killing was done after a division or disposition of the funds from the said bank had been had between the conspirators doing the killing and his co-conspirators, then I charge you the division of said proceeds of said robbery of said bank as part of said conspiracy, if any existed, made the conspiracy complete, and the killing is chargeable to the one firing the fatal shot, and not to his fellow conspirators, and they should be found not guilty.
 

 “I charge you, gentlemen of the Jury, that before you would be justified in finding a verdict of murder, or any other crime included in said charge, against these defendants, or any two or more of them, you must be convinced, beyond a reasonable doubt, that the State has proven the existence of a conspiracy not only to rob the officers and employees of the Rocheblave Market Branch of the Canal Bank and Trust Company, but that the State has also proven to your satisfaction and beyond a reasonable doubt, that as a part of the said conspiracy, and in furtherance thereof, the defendants, or any two or more of them, also conspired and agreed between themselves, as a part of said common purpose and design, to resist with great violence, even to the extent of taking human life, anyone who might attempt to apprehend them in their escape.
 

 “I further charge you, that if the evidence should satisfy you beyond a reasonable doubt, that the defendants, or any two or more of them, did enter into a conspiracy to rob the officers and employees of the Rocheblave Market Branch of the Canal Bank and Trust Company, and that they or any two or more of them, in execution of the said conspiracy, did rob the said bank, and that the said robbery was then and there complete, but the evidence fails to satisfy you beyond a reasonable doubt that a part of the said conspiracy to rob the said bank included also, the common purpose and design to resist with great violence, even to the extent of taking human life, anyone who might attempt to apprehend them in their escape, and the evidence does satisfy you beyond a reasonable doubt, that anyone of the defendants killed the said Raymond Rizzo while resisting arrest or attempting to escape after the said bank had been robbed but that the said killing was the result of the situation in which the defendant so killing found himself and proceeded from the impulse of the moment of such particular defendant, without previous concerted agreement, understanding or conspiracy between himself and the other conspirators, then I charge you, you may find this particular defendant guilty and you should find the other defendants not guilty. * * * ”
 

 Defendants argue that the bills of exception contain, as provided by article 391 of the Code of Criminal Procedure, such a true statement of facts as show the error of the trial judge in refusing to charge the jury as requested; that the codal article means that the bill of exception must be accompanied by such statement of facts as will show the error of the trial judge, and does not mean that the facts before the jury that are to be placed in the bill of exception must be stated in the presence of the jury, or that counsel’s reasons must be stated before the jury.
 

 So far as we are aware, this is the first time this court has been called upon to interpret the codal provision in question, and we prefer to pretermit a discussion of the provision in a case such as this, in which four persons have been sentenced to pay the extreme penalty, and to consider the issues submitted by them under their bills of exception solely upon their merits.
 

 Article 390 of the Code of Criminal Procedure reads as follows:
 

 
 *1045
 
 “The prosecution and the defense have each the right to present to the court, before the argument has begun, any written charge or charges, and request that the same be given. Except as otherwise provided herein, the judge must give every such requested charge that is wholly correct and wholly pertinent, unless the matter contained in such charge have been already given, or unless such charge require qualification, limitation or explanation.”
 

 The requested charges, as shown by the statements per curiam, are not such as meet the requirements of the codal article. As stated by the trial judge, they are not responsive to the facts of this case.
 

 As disclosed by the record, the state’s contention before the jury was that the defendants not
 
 only
 
 conspired
 
 to rob the
 
 bank, but that the conspiracy also contemplated a division of the booty among the conspirators and embraced the common purpose of resisting arrest with extreme violence and of killing any person who interfered with or attempted to apprehend them.
 

 And it is vigorously contended on behalf of the defendants Jacks and Rylich that they are not guilty in law of the murder of Rizzo, because the evidence shows that they had left the scene before the robbery was completed and Rizzo was shot, that Jacks was unarmed and was only to drive the automobile, and that no shots were fired from the automobile.
 

 We think that the law of conspiracy and the responsibility of conspirators, as applied to the facts of this case, was fully and correctly given by the trial judge in his general charge as hereinabove set forth.
 

 The undertaking of the defendants was to rob the bank and to divide the proceeds of the robbery. This adventure continued to be a joint one until the .division of the proceeds took place. See State v. Bolden, 109 La. 484, 33 So. 571; Osborne v. State, 99 Miss. 410, 55 So. 52; Baldwin v. State, 46 Fla. 115, 35 So. 220.
 

 In the case of Holmes v. State, 6 Okl. Cr. 541, 119 P. 430, 437, 120 P. 300, the court held:
 

 “Where a conspiracy embraces not merely a series of unlawful acts, but also extends to a division of the fruits and proceeds of such acts among the co-conspirators, anything said or done by them, although after the commission of the unlawful acts, but before a disposition or division of the proceeds of such acts, is admissible evidence against all the other conspirators. See State v. Pratt, 121 Mo. 566, 26 S. W. 556; Scott v. State, 30 Ala. 503; People v. Pitcher, 15 Mich. 397; State v. Grady, 34 Conn. 118. The theory upon which such evidence is admissible is that the conspiracy does not terminate until there has been a division of its fruits or spoils. See People v. Opie, 123 Cal. 294, 55 P. 989. Conspirators are also responsible for the acts of their eo-eOnspirators done for the purpose of escaping detection and arrest. See State v. Thaden, 43 Minn. 253, 45 N. W. 447.”
 

 Where several persons combine to commit an offense and a homicide is committed by one of them in order to effect his escape, the others cannot be held responsible for the homicide unless they consented and were privy in fact thereto, or had the common purpose of resisting with extreme violence or to kill any person who interferes with or attempts to apprehend them. But if the conspirators contemplate and intend the doing of everything necessary to effect an escape, and this may be inferred from the fact they arm themselves, they will be responsible for a homicide committed by one either in effecting his own escape or aiding in the escape of any or all of his comrades. On the other hand, if the conspirators had only the
 
 *1047
 
 common purpose' of committing an offense and one of the-conspirators commits a murder merely as a result of the situation in which he finds himself, and proceeding from the impulse of the moment, without any previous concert, his coconspirators would not be guilty of murder. People v. Marwig, 227 N. Y. 382, 125 N. E. 535, 22 A. L. R. 845; Rex v. Collison, 4 Car. & P. 505; People v. Kauffman, 152 Cal. 331, 92 P. 861; People v. Pool, 27 Cal. 572; People v. Woods, 147 Cal. 265, 81 P. 652, 109 Am. St. Rep. 151; Hamilton v. People, 113 Ill. 34, 55 Am. Rep. 396; Ruloff v. People, 45 N. Y. 213; Conrad v. State, 75 Ohio St. 52, 78 N. E. 957, 6 L. R. A. (N. S.) 1154, 8 Ann. Cas. 966; State v. Lesesne, 112 S. C. 250, 100 S. E. 62; Brill’s Cyc. of Law, § 263, p. 473; Huggins v. State, 149 Miss. 280, 115 So. 213.
 

 In the ease at bar the proof of the common purpose to forcibly take the money of the bank, carry it away, and make a safe escape, may be inferred from all the attending circumstances. The existence of such a criminal intent was a question for the jury. The defendants started upon their criminal enterprise with three of them armed with revolvers. O’Day carried two pistols, one of which was furnished him by Jacks. They provided . an ■ automobile in which to flee. Jacks was selected as the driver of the ear because- of his knowledge of local conditions. From- the moment of leaving their automobile, which was stationed near the bank in charge ofJacks, they began to shoot. Rylich shot down Officer Alberts, and in his retreat to the waiting automobile exchanged several shots with citizens. Taylor shot at the manager of the bank.- Taylor and O’Day ran out of and away -from the bank continuing to fire at' pursuing citizens and police officers. After the fatal shooting" of Rizzo, Taylor was captured With his discharged weapon in his possession: And' later O’Day, Rylich, and Jacks were arrested at, or fleeing from, the prem-' ises, where the conspiracy was formed and from which the conspirators started upon-their enterprise. Cf. Burns v. State, 192 Ind. 427, 136 N. E. 857; Commonwealth v. Doris, 287 Pa. 547, 135 A. 313.
 

 In Romero v. State, 101 Neb. 650, 164 N. W. 554, 555, L. R. A. 1918B, 70, it was held that, where two or more persons in furtherance of a common purpose enter upon the perpetration of a burglary armed and prepared to kill if opposed, and being discovered in the commission of the crime, one of the .burglars, in the effort to escape, shoots and kills a person who is trying to apprehend him, all the parties are guilty of the homicide, although one of them was not armed with a deadly weapon and escapes before the shooting and such shooting is not part of the prearranged plan. The court aptly said:
 

 “Both in morals and in law, if a man means one wrong and does another, he is punishable. This is true as to the individual, even though the killing may be unintentional or even accidental. Where one shares with others in the burglarious intent and act, and killing results from it as one of its natural, ordinary, and probable consequences he .will not be heard to say, that he did not intend or share in it. In the instant case the plaintiff by his own testimony knew that his companion had a gun. “ He was bound to know that his companion might use it in resistance of an officer who might attempt to arrest him. The attempt to arrest is an interference with their plans. It is common experience that persons engaged in committing a felony may kill those who interfere. Such appears to be the general, though possibly not the universal, holding of the courts.”
 

 One who has joined in a common design to kill or to commit an unlawful act,
 
 *1049
 
 the natural and probable consequence of the execution of which involves the contingency of taking human life, may escape responsibility by withdrawing from the undertaking before the homicide is committed by a confederate, if such withdrawal is communicated to his associates under circumstances that would permit them to do likewise. But if his withdrawal is not communicated at all, or under such circumstances as would not permit his confederate to withdraw, he is responsible for the homicide committed by such confederate in pursuance of the original design, or as a natural or probable consequence of its execution. One’s withdrawal from the scene of the homicide intending that such action should advise his associates that he has withdrawn from participation in the common design may be considered in determining whether the withdrawal was communicated to his associates, but it does not necessarily establish the fact of the withdrawal or of its communication. See 29 O. J. § 48, p. 1076.
 

 “A conspirator cannot escape responsibility for an act which is the natural result of a criminal scheme which he has helped to devise and carry forward because, as the result of either fear or even of a better motive, he concludes to run away at' the very instant when the act in question is about to be committed and when the transaction which immediately begets it has actually been commenced.” People v. Nichols, 230 N. Y. 221, 129 N. E. 883, 886.
 

 8. The motions for new trials filed by all the defendants contain substantially the same allegations, and are leveled at the alleged errors of the trial judge to which bills of exception were reserved.
 

 Each motion also specifically alleges that ■there was no legal evidence before the jury to sustain its verdict,, and to each , motion the entire testimony adduced on the trial of the case is attached.
 

 All the defendants contend there is no evidence in the record to show that they had entered into a conspiracy to resist' arrest after the robbery of the bank was committed. Defendants Rylich and Jacks contend that the evidence shows they had abandoned the conspiracy before the robbery was cofnpleted. O’Day contends that the evidence shows he was not with Taylor when the deceased, Rizzo, was shot; and Taylor contends that the state did not prove beyond a reasonable doubt he fired the fatal shot from which Rizzo died —all his eodefendants joining with him in this contention.
 

 But this, court cannot determine the sufficiency of the evidence on which the defendants were convicted. And our rulings on the bills of exception reserved by the defendants dispose of the issues raised therein and reiterated in defendants’ motions for new trials.
 

 Defendants’ motions in arrest of judgment reiterate their attack on the allotment of the case. Defendants’ complaint in this respect is disposed of in our consideration of the bills of exception under which they raise the same issue.
 

 In the assignments of errors filed in this court, defendants set forth at length their complaints against the alleged errors committed by the trial judge as set forth in the bills of exception reserved by them and in failing to sustain their motions in arrest of judgment.
 

 The defendants also assigned as error that portion of the judge’s charge wherein he charged in substance that the conspiracy with which the defendants were charged in the indictment was not at an end until the fruits of the robbery were divided. ,
 

 
 *1051
 
 No objection was made to the charge, which we think should have been done in the court below before the jury retired. Code Cr. Proc. art. 391; State v. Johnson, 171 La. 95, 129 So. 684. But, be that as it may, we find no merit in defendants’ complaint. The charge of the trial judge, a portion of which we have hereinbefore quoted, correctly and accurately states the law relative to conspiracies and the responsibilities of the conspirators.
 

 For the reasons assigned, the convictions and sentences appealed from are affirmed.