ROGERS, Justice.
 

 Pierre N. Rizan was murdered on December 31, 1930, and on July 7, 1936, Joseph Ugarte, Owen Cauche, Anthony Dallao, and Joseph Oliver were indicted for the crime. A severance was granted Oliver and he was used as a state witness on the trial of the other indictees.
 

 All the defendants filed motions to quash the array and the venire, to quash the indictment, for a bill of particulars, and for a continuance. In addition, Ugarte pleaded to the jurisdiction of the court and Cauche asked for oyer of certain documents alleged to be in possession of the local police department. The trial judge overruled the motions and pleas and on July 22, 1936, the defendants were placed on trial. On July 28, 1936, the jury returned an unqualified verdict of guilty against all the defendants, and on October 19, 1936, after their motions for a new trial were overruled, they were sentenced to death. From their conviction and sentences, defendants have appealed to this court.
 

 In the course of the trial, various rulings of the trial judge were excepted to by the defendants. Some of the exceptions were reserved by the defendants individually and some of them were reserved by the defendants jointly.
 

 Article SOI of the Code of Criminal Procedure reserves to the defendants tried jointly in a criminal proceeding the bills of exception taken by all the defendants indiscriminately. And by agreement of counsel, supplementary to the provisions of the codal article, it was stipulated that a bill of exception reserved by any defendant would enure to the benefit of his codefendants.
 

 We shall discuss first the legal propositions common to all the defendants and, secondly, the legal propositions applicable only to a particular defendant, without specific reference to the bills of exception. But before entering upon the discussion, we think it proper to state briefly the facts which the evidence introduced by the state tended to establish, in order that the legal propositions involved may be easily understood. They are as follows, viz.:
 

 In the latter part of the month of December, 1930, the three defendants Joseph Ugarte, Owen Cauche, and Anthony Dallao, together with Joseph Oliver, James Kava
 
 *403
 
 naugh, George Dallao, and Claude Cefalu, entered into a conspiracy to rob the branch bank of the Whitney National Bank, situated at the corner of Piety and Dauphine streets, in the city of New Orleans. Their agreement, which was made at No. 541 St. Mary street, the combined place of business and home of Anthony Dallao, was that the robbery should take place between 10:45 and 10:50 o’clock on the morning of December 31, 1930. At this meeting Anthony Dallao in response to an inquiry stated that he would furnish the guns and the automobile required by the conspirators to accomplish their purpose. At the same meeting it was also agreed among the conspirators that they would assemble at the same place on the night preceding the day on which the bank was to be robbed in order to arrange the details of their proposed crime.
 

 The conspirators met at the appointed place and time and agreed upon their plan of action. They discussed the question of hoods, raincoats, and weapons, which were produced by Anthony Dallao. Three of the conspirators left the premises for the purpose of stealing an automobile to be used by the robbers in fleeing from the bank. On their return they advised their coconspirators that they had been successful in their mission and had “planted” the stolen car in a convenient spot near the bank ready for the next day. On the same night Anthony Dallao drove his coconspirators, except George Dallao, in his own car to the scene of the proposed crime, to view the bank and to survey the neighborhood, so as to devise an easy aproach to the bank and a quick flight therefrom after the robbery. It was then agreed among the conspirators that the bandit car would be parked in front of the bank against traffic at the corner of Dauphine and Piety streets, in order that the driver would have a clear view of all traffic moving on the intersecting streets. After viewing the bank and inspecting the neighborhood, the conspirators returned to the home and place of business of Anthony Dallao, where they remained during the night. Before retiring, Anthony Dallao and George Dallao left in the former’s car to steal an automobile to be used in robbing the bank on the following morning. Anthony Dallao returned alone with the stolen car, which he parked in his garage.
 

 The next morning the conspirators arose about 8 o’clock and were furnished with coffee and drinks by Anthony and George Dallao. Thereafter they went through the rear of the premises and yard into the garage of Anthony Dallao, where the stolen automobile had been parked over night. Anthony Dallao and his brother George Dallao placed in the bandit car a sugar sack containing pistols and a sawed-off shotgun, as well as the hoods and slickers to be used by the bandits. Ugarte, Cauche, Oliver, Kavanaugh, Cefalu, and George Dallao then got into the car and Anthony Dallao opened the door of his garage so as to permit the driver of the car to back it out into the street. Anthony Dallao did not get into the the car, but remained at his place of business, No. 541 St. Mary street.
 

 The bandit car was immediately driven to the bank at Piety and Dauphine streets, where it was parked against the traffic moving on Dauphine street. With the exception of the driver, all the occupants covered with hoods and slickers got out of the
 
 *405
 
 'car. Cefalu carried the sawed-off shotgun ■and each of the other bandits was, armed -with a pistol. The driver was left in the >car, with a pistol on the seat beside him.
 

 On entering the bank, the bandits shouted, '“Stick ’em up.” Pierre Rizan, the bank’s watchman, made a move in their direction, and he was promptly shot down •and killed by a load of buckshot discharged from the sawed-off shotgun in the hands of Cefalu. A young man named Gilbert J. Dietrich, a customer in the bank, grappled with one of the bandits, and Cefalu fired a load of buckshot into his back, killing him instantly. Alfred Brownson, one of the bank’s tellers, was shot in the chest and dangerously wounded by one of the bandits and Charles Dietrich, father of Gilbert J. Dietrich, who was also in the bank, was shot in the hand and slightly wounded by another bandit. One or more of the bandits entered the teller’s cage next to the cage occupied by Brownson, gathered up the money in the cage and put it in a pillowslip which the conspirators had brought with them for that purpose. When the money was secured, all the bandits retired and re-entered the automobile. They drove directly from the scene of the murder and robbery to No. 541 St. Mary street. Anthony Dallao opened the door of his garage to permit the re-entry of the automobile and then closed the door after the car was safely inside. He also assisted in removing the guns and slickers from the car. The conspirators, including Anthony Dallao, repaired to the upper part of the premises, where the money stolen from the bank, $3,160.80, was counted and divided among them, Anthony Dallao sharing equally with the others in the division of the loot. The conspirators then disbanded, each going his separate way.
 

 A few hours after the alarm was given, the police arrested Cefalu, Cauche, and Ugarte. Cefalu and. Cauche were arrested while engaged in conversation in the toilet of Lipnick’s garage on Frenchman street. A few moments after his arrest, Cauche broke from the police and fled, in his flight throwing something under a pile of trash. On examination this proved to be $485 in currency, approximately one-seventh of the amount stolen from the bank, the denominations of the bills corresponding with the denominations of the stolen money. Cauche later explained to the police that Cefalu had just given him the money, and he, having heard of the robbery, did not wish to be arrested with that amount on his person. James Kavanaugh, George- Dallao, and Anthony Dallao were also arrested in connection with the crime.
 

 The stolen car used by the bandits was the property of Gerald Pratt. At about 10 o’clock on the night of the robbery, it was found by the police in front of the premises No. 939 St. Mary street. In the automobile, when found, were two white hoods with eye-holes and one black hood with goggles cut therein, as well as several loaded shotgun shells, and a yellow tan slicker. On January 2, 1931, which was two days after the commission of the crime, the police recovered the shotgun and pistols used by the bandits at the premises of Anthony Dallao, No. 541 St. Mary street. The weapons were contained in a sugar sack. Immediately after the murder and robbery, the police found exploded and unexploded shotgun
 
 *407
 
 shells, lead pellets and parts of a copper bullet jacket on the floor of the bank. The shells were duplicates of three unexploded shells contained in the sawed-off shotgun and the copper jacket bore the rifling marks of one of the pistols found in the sugar sack.
 

 As we have stated, Cefalu, Kavanaugh, Cauche, and the Dallaos were arrested as suspects within twenty-four hours after the robbery and murders were committed. About two "hours after his arrest, Cefalu, while attempting to escape, was killed by the arresting officers. Kavanaugh, Cauche, and Ugarte were charged with the robbery of the bank and the murders of Pierre Rizan and Gilbert J. Dietrich. These indictments were returned by the grand jury on February 5, 1931. The Dallaos were charged as accessories before the fact of robbery and murder. On March 6, 1931, Cauche and Ugarte filed motions for a severance and on November-24, 1931, they filed motions for a bill of particulars. The Dallaos were arraigned and pleaded not guilty on January 11, 1932.
 

 On February 19, 1932,-James Kavanaugh was tried for the murder of Gilbert J. Dietrich, found guilty without capital punishment, and sentenced to the penitentiary for life. He remained in the penitentiary until July 11, 1936, when he was brought to New Orleans to be used by the state as a witness against the defendants. While temporarily confined in the Seventh precinct station, pending the trial of the case, Kavanaugh committed suicide by hanging himself.
 

 Doubtless, feeling that the evidence in their possession at the time was insufficient to definitely fasten the crime on Ugarte, Cauche, and the Dallaos, the local prosecuting authorities permitted the indictments to remain dormant, admitting the accused lo bail. Subsequently George Dallao was tried, convicted, and sentenced to death for the murder of Charles Rabito in the parish of Jefferson. After the conviction and sentence was affirmed by this court (State v. Daleo, 179 La. 516, 154 So. 437), George Dallao and John Capaci, his accomplice, were hanged in the parish jail, in the city of Gretna.
 

 The local police authorities persisted in their efforts to bring the murderers of Pierre Rizan and Gilbert J. Dietrich to justice. As a result of their investigations, Joseph Oliver was connected with the crime, and in June, 1936, he was arrested in the city of Los Angeles and brought back to the city of New Orleans. Following his return, the police authorities were able to secure additional evidence, and the matter in its entirety was resubmitted to the grand jury. This resulted in the return on July 7, 1936, of new indictments against Cauche, Ugarte, Oliver, and Anthony Dallao for the robbery of the bank and the murders of Pierre Rizan and Gilbert J. Dietrich. Anthony Dallao, who was in Mississippi, was extradited and brought back to Louisiana. The case of’ Joseph Oliver was severed from that of Ugarte, Cauche, and Anthony Dallao, and he was used as a witness against them on their trial for the murder of Pierre Rizan. As we have stated, the trial resulted in an unqualified verdict against the defendants; from which and the sentence to death thereunder, defendants are prosecuting this appeal.
 

 
 *409
 
 Defendants complain that the trial judge erred in refusing to uphold their challenge to the array and venire of jurors serving in his section of the criminal district court for the parish of Orleans. Defendants urge three grounds of objection to the array and venire, vizj: First, that there were not in the jury wheel at the time of the drawing of the jury the names of 1000 qualified jurors, eligible for jury service; secondly, that the placing in the jury wheel of more than 1000 names was done in such an improvident, negligent, and illegal manner as to amount to a fraud on defendants; thirdly, that the venire of jurors served upon the defendants consisted of but 33 names, which was an insufficient number to constitute a legal jury, in view of the number of peremptory challenges allowed by law to the defendants and to the state.
 

 Other than the minutes of the trial court, no proof was offered by the defendants to sustain their first and second grounds of objection to the array and venire.
 

 The case was tried during a special jury term for which the jury commission was limited by statute to the drawing of 75 names of persons to compose the venire. The minutes of the trial court showing the impaneling of the jury disclose that, due to absences from the city, inability of the sheriff to locate them, and otherwise, 15 of the , veniremen were unavailable and that 26 of the remaining veniremen were excused by the trial judge for reasons he considered good and sufficient.
 

 It is argued on behalf of the defendants that, the minute entries disclose that practically two-thirds of the persons listed on the jury panel were not qualified jurors; and, hence, it necessarily follows that two-thirds of the entire 1000 or more names placed in the jury wheel were not qualified jurors.
 

 The argument is more theoretical than factual in its application to defendants’ complaint.
 

 The jury commissioners for the parish of Orleans are required to keep in the jury wheel a minimum of 1000 names of competent jurors, and to place in the wheel only the names of those persons whom after personal examination they have found to be competent.
 

 The law presumes the legality of an array or a venire and he who asserts the contrary must prove it. State v. Gonsoulin, 38 La.Ann. 459; State v. West, 116 La. 626, 40 So. 920; State v. Bussa, 176 La. 87, 145 So. 276. No proof was offered by defendants to rebut this presumption. The mere circumstance that fifteen veniremen were unavailable for the trial of defendants is not sufficient to overcome the presumption that they were competent jurors-when their names were placed in the jury wheel perhaps many months before.
 

 In the trial of every criminal case, the nonattendance of some of the veniremen for unforeseen causes is to be expected. It is something that no human foresight can provide against, but it can never become serious, unless it can be shown that fraud has been committed or that a wrong has been worked on the defendant. Such is not the case here.
 

 We do not find any analogy between the cases of State v. Love, 106 La. 658, 31 So.
 
 *411
 
 289, and State v. Tate, 185 La. 1006, 171 So. 108, cited by defendants, and the instant case. The irregularities complained of in the cited cases were so gross as to amount to a wrong per se on those affected by them. Defendants in this case make no showing of fraud, wrong, irregularity, or injury in the drawing and summoning of the jury. In these circumstances, the case of State v. Smothers, 168 La. 1099, 123 So. 781, is more in point than the cases of State v. Love and State v. Tate.
 

 Under article 345 of the Code of Criminal Procedure, it is within the discretion of the trial judge to excuse for cause jurors of the regular venire. It is to be expected that in every criminal prosecution the trial judge may be called upon to exercise this discretionary right. This is particularly true in cases of great public interest, such as the present case. The right, when exercised by the trial judge, will not be interfered with on appeal unless it clearly appears that it has been abused or that the defendant has been prejudiced thereby. State v. Ardoin, 136 La. 1085, 1086, 68 So. 133; State v. Gould, 155 La. 639, 99 So. 490.
 

 The right of a defendant in a criminal prosecution is that of eliminating incompetent jurors, not of selecting jurors of his choice. State v. Ardoin, supra. He has no right to a trial by any particular juror or jurors, but only to a trial by a competent and impartial jury. State v. Bagwell, 154 La. 980, 98 So. 549.
 

 We do not find that the trial judge abused his discretion in excusing the veniremen. As shown by the record, none of the veniremen was excused by the trial judge on his own motion. Each, venireman appeared personally before the trial judge and asked to be excused from-the -venire. And he was excused only after he had been carefully examined by the trial judge and had presented good and sufficient reasons therefor.
 

 Nor do we find that the defendants were-tried by an incompetent or partial jury. The record shows that the jury was selected in conformity to law. Five jurors were obtained before the regular jury panel5 was exhausted. Two jurors were obtained from the jury panel of another section of the same court, the members of' which had been summoned as tales jurors by order of the trial judge. The remaining 5 jurors were obtained from a panel' containing the names of 200 additional' tales jurors drawn from the jury wheel by the jury commissioners in open court,, also by order of the trial judge. In. the impaneling of the jury, the state used, seven peremptory challenges and the defendants used thirteen peremptory challenges.
 

 Defendants’ objection that the regular jury venire was not legally constituted, because the venire list served on> them contained only 33 names, was properly overruled by trial judge.
 

 As we have hereinabove stated, the record shows that the jury commission, as provided by law, drew from the jury wheel the names of 75 persons who had qualified’ before them as competent jurors to compose the regular jury venire for the* July term of the trial court. Because of;
 
 *413
 
 unavoidable circumstances, 15 veniremen were unavailable and 26 veniremen were excused for cause. Therefore, the regular jury venire for the trial of the case contained the names of 33 veniremen, a list of which was served on the defendants. It would have served no useful purpose to include in the list the names of the absent, not found and excused jurors.
 

 When a venire has been regularly drawn, the nonattendance of unavailable or excused jurors, without fraud or collusion and without material injury to the accused, is not sufficient cause to quash the panel. State v. Gould, 155 La. 639, 99 So. 490; State v. Dozier, 33 La.Ann. 1362.
 

 In State v. Gould, the trial judge excused 37 of the 75 jurors drawn to make up the panel. This court held that the venire composed of the remaining 38 jurors was sufficient.
 

 In State v. Dozier, this court refused to sustain a challenge to the venire based on the failure of the sheriff through mistake to summon one of the jurors. The court correctly observed, at page 1364 of 33 La. Ann., that:
 

 “The law does not guarantee that the prisoner shall be presented with thirty-four jurors from which to select his jury. It provides for the drawing and summoning of that number exclusive of the grand jury, but it fully recognizes that various causes, such as disqualifications, absence, errors or mistakes of officers charged with executing process and the like, may prevent the actual attendance of all of them, and it provides that, in absence of fraud and wrong, such ‘defects’ shall not invalidate the venire. If they had such effect, the administration of justice would be embarrassed if not entirely stopped.”
 

 The law did not guarantee that defendants would be presented with 75 names from which to select their jury. It only guaranteed that number would be drawn for the regular jury venire. The fact that due to disqualifications, absences, mistakes, and other causes the venire was composed of a less number was not sufficient to invalidate it, in the absence of fraud or wrong. Code Crim.Proc. art. 203. No showing of fraud, wrong, or injury is made by defendants in support of their complaint.
 

 Defendants complain that the trial judge erred in overruling their objection to the summoning of tales jurors before 8 absent jurors of the regular panel had been called.
 

 The record discloses that in the impáneling of the jury the names of the 33 jurors on the regular venire list were called in order that the jurors might present themselves for examination on their voir dire. Eight of the veniremen, whose names are set forth, failed to answer. At that time no request was made by the defendants that the absent jurors be attached. After 5 jurors had been selected from the 25 regular jurors who had answered to their names, the deputy sheriff attached to the trial court announced that the regular venire had been exhausted. Defendants then requested that the 8 absent jurors be called and the coercive powers of the court be used to compel their attendance, and de
 
 *415
 
 fendants objected to the calling of any tales jurors until their request had been complied with.
 

 The trial judge denied defendants’ request, stating that before commencement of the trial he had excused 7 of the 8 absent jurors for cause, and that he knew nothing about the other absent juror, one H. H. Herr.
 

 Not having requested attachments for the absent jurors when the regular venire was called, defendants could not obstruct or delay the regular course of the proceeding by doing so thereafter.
 

 After a trial of a criminal case has commenced, it is too late for the defendant to move for the attachment of absent jurors. Code Crim.Proc. art. 346; State v. Saunders, 37 La.Ann. 389; State v. Harp, 133 La. 1007, 63 So. 500.
 

 But defendants insist that pursuant to their request they were entitled to have the 8 jurors called, particularly the juror Herr. Obviously, it would have been a useless proceeding to call the 7 jurors who had been previously excused by the trial judge.
 

 In support of their contention that the juror Herr, who had not been excused, should have been called, defendants rely on article 347 of the Code of Criminal Procedure and the prior jurisprudence which is reflected in the codal article. See Marr’s Crim.Jurisprudence (2d. Ed.) Vol. I, § 422, p. 640.
 

 Article 347 of the Code of Criminal Procedure provides: “When the regular venire has been exhausted without completing the panel, the judge shall, if the prosecution or thé defense so request, order the sheriff to call the absent jurors •at the court house door, before it shall be permissible to tender any talesmen.”
 

 From the prior jurisprudence to the same effect, defendants have selected and cited State v. Atkinson, 29 La.Ann. 543, State v. Ross, 30 La.Ann. 1154, and State v. Riggs, 110 La. 509, 34 So. 655.
 

 Analyzing the cited cases, we find that in the Atkinson Case, 5 veniremen, who were discharged from two other juries on the preceding day, were actually present in court. When the sheriff began to call the talesmen, counsel for the defendant objected and moved the court to order the sheriff to call the 5 veniremen who were then in court. The trial judge refused to grant the order, and on appeal his ruling was disapproved. In so doing, this court held: “The court need not wait, should not wait, when the names of the regular venire have once been called; but if, before the talesmen are called and the jury completed, members of the regular venire who were not present at the first calling come into court, they should be called, and the jury completed from them if practicable.” In State v. Ross, the trial judge had ordered the jurors to remain in the courtroom. In impaneling the jury, a number of the veniremen failed to answer their names when called. Without completing the jury, the regular panel was exhausted. The trial judge refused defendant’s request that the absent jurors be called before talesmen were summoned. The trial judge denied the request, for the reason that he had previously announced
 
 *417
 
 the jurors would be called at the bar and not at the door, and must be present in the courtroom. But this court held that he erred. That he might very well notify the jurors to remain in the building, and jpunish them for disobedience; but the íact that he did so inform them should not deprive the defendant of having s'o reasonable a verification of their absence as he had asked for. In State v. Riggs, only 10 of the regular venire of 30 jurors appeared in court, and the trial judge ordered the summoning of tales jurors. The defendant objected, on the ground that all the names of the 30 regular jurors had not been called to determine whether they were all in court. The trial judge overruled the objection and he also denied defendant’s request that the testimony of the facts on which he based his hill of objection to the ruling be taken down by the clerk. This court held that the trial judge erred in denying defendant’s request that the facts be taken down by the clerk. That under the statute, Act No. 113 of 1896, it was his mandatory duty to do this.
 

 Thus, it will appear from the jurisprudence reflected in the cited cases that all the law contemplates and intends is that the venire summoned in accordance with its provisions, shall, as far as it may be practical, perform the entire jury duty of the term for which they are summoned.
 

 And in State v. Saunders, 37 La.Ann. 389, this court has declared: “The right of the accused to be tried by jurors on the regular list which has been served upon him must yield to the practical necessity of proceeding with the trial when once begun.”
 

 In State v. Harp, 133 La. 1007, 63 So. 500, 2 of the regular jurors failed to answer their names when called-. The trial judge announced that he would not order attachments at that time for the absent jurors. On the next day the trial proceeded, and 1 of the regular jurors was accepted and sworn. The 2 absent jurors were again called, but did not answer. The regular venire having been exhausted, talesmen were called. The defendant objected to further proceedings until the absent jurors could be had, or it had been ascertained they could not be had. Defendant’s objection was overruled. At no time had the defendant requested that the absent jurors be attached. This court held that the ruling of the trial judge was correct.
 

 In .this case, the names of the 8 absent jurors had been called previously as members of the regular venire. Defendants’ request was not merely that the 8 absent jurors be called. The calling of the .jurors was merely incidental to the primary purpose of their request, which was that the coercive powers of the court be exercised to compel their attendance. This, we think, is the import of the bills of exception. As shown by the bills, the statement of the trial judge is, that he excused 7 of the absentees for cause and that he knew nothing of Herr, the other absentee. The plain meaning of which, we take it, is that the trial judge had in mind the primary purpose of defendants’ request was that he exercise his coercive powers against the absentees, and as he had excused 7 of the absentees
 
 *419
 
 and the whereabouts of the other absentee was unknown, it would be a useless waste of time to delay the trial while the sheriff made a search for the missing veniremen. At that time 5 jurors had been accepted, 7 jurors were needed to complete the jury and talesmen were summoned from the regular venires of other sections of the court for examination on their voir dire.
 

 If it were important to defendants that the name of Herr, the absent and unaccounted juror, be called and that was the primary purpose of their request, it was their duty to make that purpose clear to the trial judge. If, when the trial judge had announced that he had excused 7 of the absentees, and that he was unable to account for the other absentee, defendants had then and there insisted that Herr, the absentee, be called, we have no reason to doubt that the trial judge would have acceded to their request. But they did not do this and they proceeded with the trial, leaving the impression on the mind of the trial judge that the only matter of importance 'involved in their request was that the entire 8 absentees be attached and brought into court.
 

 Neither error nor injury is disclosed by the record. It is not shown that the juror Herr was in court at the time the order was issued for the summoning of the tales jurors. The tales jurors were not summoned from the bystanders, but, as provided by law, they were summoned from the regular venires of the other sections of the criminal district court, and from the list of 200 names drawn by the jury commissioners from the jury wheel in open court. There is no complaint as to the fairness or the impartiality of the jury which was impaneled to try this case.
 

 We find nothing in the incident referred to by defendants that would justify us in setting aside the verdict of the jury. Code Crim.Proc. art. 557.
 

 Defendants complain of the refusal of the trial judge to hear evidence on their motions to quash the indictment, on the ground that it was predicated on incompetent and illegal evidence. Their specific ground of objection to the finding of the grand jury was that it rested exclusively on the purported statement of Joseph Oliver, a codefendant, which was read to or by the members of the grand jury, Oliver not being present. We find no merit in defendants’ complaint.
 

 The finding of a grand jury is not a verdict or judgment; it amounts, at most, to an accusation, and there is no law which fixes the nature or the quantum of evidence on which the grand jury must rest their conclusions. State v. Lewis, 38 La.Ann. 680; State v. Vial, 153 La. 883, 96 So. 796.
 

 It is the legal duty of every member of a grand jury to inform his fellows of any crime or misdemeanor committed - within the parish since the sitting of the last grand jury, which may have come to his personal knowledge, or of which he may have been informed, and a violation of this duty is made a criminal offense by section 2140 of the Revised Statutes of' 1870, punishable by severe penalties. State v. Vial, 153 La. 883, 96 So. 796.
 

 
 *421
 
 A grand jury may return a valid indictment into court based on knowledge of the facts by its members, and without having witnesses summoned before that body. State v. Richard, 50 La.Ann. 210, 23 So. 331; State v. Britton, 131 La. 877, 878, 60 So. 379; State v. Vial, 153 La. 883, 96 So. 796.
 

 Defendants complain of the refusal of the trial judge to grant them a continuance. The indictment on which defendants were tried was returned on July 7, 1936, -and the case was called for trial on July 22, 1936.
 

 The trial judge assigns the following reasons for his refusal of defendants’ application for a continuance, viz.:
 

 The murder and robbery for which defendants were put on trial were committed about 11 o’clock in the morning of December 31, 1930, five and one-half years before the date set for the trial. The three defendants, together with Claude Cefalu, James Kavanaugh, and George Dallao, were arrested as suspects within twenty--' four hours after the crime had been committed. Cefalu was killed by a police officer shortly after his arrest. Kavanaugh and the defendants Cauche and Ugarte were charged with the murder and robbery and George Dallao and the defendant Anthony Dallao were charged as accessories to the crime. Subsequently, Kavanaugh committed suicide and George Dallao was hanged for the murder of Charles Rabito. In the indictment returned on July 7, 1936, Anthony Dallao was indicted as a principal with Joseph Oliver, Joseph Ugarte, and Owen Cauche.
 

 The attorneys who applied for the continuance were the same attorneys who had represented the defendants at the time of their indictment and arraignment in 1931 and who had continued to represent them up to and through their trial in 1936. In the early part of the year 1932, the defendant Ugarte filed a list of witnesses under the indictment charging him with the murder of Gilbert J. Dietrich and the defendant Cauche filed a list of witnesses under the indictment charging him with the robbery of the bank. The name of every witness contained on the lists furnished by Ugarte and Cauche at that time appeared on the list of witnesses filed by them in this case.
 

 The defendant Ugarte in his motion for a continuance alleged that ■ the publicity given the case rendered it impossible for him to secure a fair and impartial trial. The trial judge specifically asked Ugarte’s counsel if he were seeking a change of venue, and received a reply in the negative. Counsel argue that a change, of venue would not have availed the defendant, because the publicity creating the prejudice in New Orleans would tend to create similar prejudice in the adjoining judicial districts, of which New Orleans is the key city. But the record fails to show the existence of the alleged prejudice. On the contrary, it discloses that no difficulty whatever was experienced in obtaining a fair and impartial jury to try this case. The second ground urged by the defendant Ugarte was the absence of a witness, one Louis Weisdorffer. But the attendance of this witness was secured almost immediately by the trial judge.
 
 *423
 
 Weisdorffer was placed on the stand by Ugarte and testified in his behalf .on the trial of the case.
 

 The defendant Cauche alleged in his motion for a continuance that the trial judge had refused him permission to inspect the records in possession of the police department of the city of New Orleans ; and that by reason of such refusal it was impossible for him to obtain the names of the witnesses who would testify in his favor, and he was, therefore, unable to properly present his defense on the day fixed for the trial.
 

 The trial judge refused defendant’s request under the provisions of section 5 of Act No. 242 of 1912, as amended by Act No. 255 of 1920, § 3, which provides that the records held by the police authorities as evidence for the prosecution of a criminal charge are not subject to public inspection until after they have been used in open court or the criminal charge had been finally disposed of.
 

 The second ground urged by Cauche for a continuance was the absence from New Orleans of Fred Parenti and Mrs. Fred Parenti, two witnesses whose names were on the list of witnesses filed by him in court in the early part of the year 1932. Cauche alleged that Mr. and Mrs. Parenti would support his defense of an alibi. He also alleged that these witnesses were presently in Long Beach, Cal., and that he could have them here for the trial if it were postponed for thirty days.
 

 The trial judge, in his per curiam, states that when he called upon Cauche’s, attorney' to sustain the allegations of' the motion for a continuance, he was unable to give the court any definite information or assurance that these witnesses who had moved from Louisiana to California could be returned or would be returned to the jurisdiction of the court to testify in the case. The witnesses were beyond the processes of the court, and no showing whatsoever was made by the defendant Cauche to justify the allegation that he could secure the presence of these witnesses within a reasonable time. All other alibi witnesses except these two were presented by Cauche, and the facts that were alleged that these witnesses would testify to were testified to by the other witnesses. Testimony was also given the jury to show that the witnesses were in California.
 

 The trial judge directs attention to the fact that three months later, on October 19, 1936, when Cauche filed a motion for a new trial, he simply alleged that the court erred in not granting him a continuance as originally prayed for. At that time, the defendant had nothing to offer in aid of or to strengthen his original motion for a continuance that he could have secured or could secure the presence of the absent witnesses.
 

 A very wide discretion is allowed trial courts in the matter of continuance, and, unless there be an apparent abuse of it, the court on appeal will not interfere. State v. Bischoff, 146 La. 748, 84 So. 41.
 

 Where the bill of exception and the statement of the trial judge in connection therewith, considered together, fail to show a reasonable prospect of securing the presence of absent witnesses — nonresidents
 
 *425
 
 of the parish — upon any future occasion, the ruling of the trial judge refusing a continuance will not be disturbed. State v. Simpson, 133 La. 576, 63 So. 179.
 

 And where the absent witnesses are nonresidents of the state, it would be a most unusual proceeding to continue a case for the purpose of allowing defendants-to communicate with the absent witnesses to ascertain if their voluntary attendance could be obtained. Defendants in criminal cases could multiply absent witnesses at each succeeding term and impose upon the indulgence of the court, and thus indefinitely postpone the trial. When the witnesses are beyond the jurisdiction of the court, the matter of- granting a continuance is within the discretion of the trial judge. There is no legal right for a case to be postponed on such a showing, and a refusal to grant the delay, even in a meritorious case, would not authorize us to review the discretion exercised by the trial judge. State v. Nash, 45 La.Ann. 1137, 13 So. 732, 734.
 

 Furthermore, as stated by the trial judge, no attempt was made in connection with the motion for a new trial to show that the defendant had sustained any injury by the refusal of the trial judge to continue the case.
 

 Unless it be shown that some special and sufficient reason was assigned and made good in support of an application for a continuance and that the trial judge acted arbitrarily and was guilty of a denial of'justice, his rulings, in two instances, the one affirming the other, at different stages, particularly when the last was made on a motion after verdict, will not be revised on appeal. We cannot for a moment suppose, had it been shown by the motion for a new trial that the continuance asked and refused on the day of trial should have been allowed and for that reason the defendant did not have a fair trial, the trial judge would not have set aside the verdict and granted the defendant a new trial. We must and do believe that in acting as he has done he has discharged his duties conscientiously and has done no injustice to the defendant. State v. Pouncey, 182 La. 511, 162 So. 60.
 

 State v. Thornhill, 186 La. 447, 172 So. 522, cited by defendant, is not applicable to the facts of this case.
 

 The defendant Dallao alleged in his motion for a continuance that the alleged offense was committed on December 31, 1930; that he was indicted for murder on July 7, 1936, and arraigned on July 13, 1936; that defendant has been incarcerated since his arraignment; and that it had been impossible for him to locate and summon his witnesses.
 

 As shown by the per curiam of the trial judge, the defendant Dallao presented in his defense only two witnesses for the purpose of disassociating himself from the weapons found upon his premises. This apparently was his only defense. Dallao’s attorney insisted upon securing the attendance of an alleged witness named Durr. The trial judge caused the highway police to bring Durr into court from Ponchatoula, La. When this witness was tendered to Dallao’s attorney, he dismissed him without putting him on the stand to testify.
 

 
 *427
 
 There was nothing in the motions for a new trial filed by Dallao and Ugarte three months after their conviction from which it appears or can even be inferred that the continuance asked for and refused on the day of trial should have been allowed.
 

 We find no error in the ruling of the trial judge refusing defendants a continuance.
 

 All the defendants moved for a bill of particulars. The motions were denied as to Ugarte and Cauche, but granted as to Dallao. On appeal, Ugarte has expressly abandoned his complaint of the ruling. Cauche has submitted his complaint of the ruling without argument, which may be considered as a waiver of the complaint. The bill of particulars granted Dallao will be discussed later in connection with his contention that he was erroneously charged and tried as a principal and not as an accessory before the fact.
 

 Defendants complain of the overruling of their objections to certain questions propounded to Maurice O’Niell, who was called by the state as an expert on ballistics or .firearms identification. The questions objected to were as to whether the witness had studied the technique and methods of the Federal Bureau of Investigation, at Washington, D. C., and of the Crime Laboratory of Northwestern University and compared them with his technique and methods and to state the result of the comparison; also as to whether his studies and investigations as an expert had disclosed that accepted and authoritative experts had actually conducted experiments for the purpose of ascertaining if two pistols would or would not fire unmistakably different bullets. His answer being, that he knew of such an experiment which was conducted by United States Army officers at the Frankfort Arsenal. We find no error in the rulings of the trial judge.
 

 Firearms identification or the science of forensic ballistics is a well-recognized subject of expert testimony. The federal government has established at Washington, D. C., a department for firearms identification. Northwestern University, at Evanston, 111., has made
 
 an
 
 exhaustive study of the subject in its scientific crime detection bureau, whose director is Prof. Calvin H. Goddard, one of the leading ballistic experts of the world and quite frequently a major witness in homicide cases in different states, being recognized as an authority on the matter. Underhill’s Criminal Evidence (4th Ed.) § 243. To the same purport, see Wigmore’s Principles of Judical Proof (2d Ed.) p. 122, par. 62.
 

 Col. Goddard, the expert referred to in the text of Underhill’s work, was used and approved as a ballistic expert in the case of Evans v. Commonwealth, 230 Ky. 411, 19 S.W.(2d) 1091, 66 A.L.R. 360. In that case, the court reviewed many cases in which similar testimony had been given and sustained.
 

 The clear purpose of the alleged objectionable questions was to establish the qualifications of the witness as an expert on the subject on which he was called to testify, derived not only from his own study and experience, but also from the study and experience of well-recognized
 
 *429
 
 and accepted authorities with which he was familiar, and to ascertain whether in his experiments concerning the firearms involved in this case he had followed the technique and methods prescribed by those authorities.
 

 Defendants complain that over their objection the trial judge permitted testimony to go to the jury which was at variance with the opening statement of the district attorney.
 

 Defendants contend that Charles Dietrich, the father of Gilbert J. Dietrich, who was in the bank at the time of the murders and robbery, testified as a witness for the state that the defendant Cauche wore the black hood and carried the automatic shotgun and was the bandit who killed his son, because he heard him speak in the bank and also in the Third precinct station, and that the voice in both instances was that of the same man.
 

 The per curiam shows that defendant Cauche offered no objection to the testimony at the time it was given. Later, after the witness had left the stand, defendant Cauche for the first time objected to the testimony on the ground that it conflicted with the opening statement made by the district attorney. The trial judge promptly sustained the objection and instructed the jury to disregard that portion of the testimony of the witness. Cauche then moved for a mistrial, which the trial judge refused. At the conclusion of the taking of evidence, Cauche again moved for a mistrial, filing in the record a written motion to that effect. Cauche was joined in his objection and motion by both his codefendants Ugarte and Dallao. The motion was denied.
 

 Cauche, in his motion, incorrectly alleged that the witness Dietrich was offered by the state for the purpose ’ of proving . that he, Cauche, was the. bandit who wore the black hood and who murdered Pierre Rizan. As shown by the record, the witness Dietrich was called by the state only because he was present in the bank throughout the course of the robbery and had witnessed the murders, and he was offered to testify to what had occurred in the bank at the time.
 

 After showing in his per curiam that he sustained the objection when made and instructed the jury to disregard that part of the testimony, the trial judge states that the state contended in the opening statement of the district attorney and by its witnesses, consistently and persistently, that the black-hooded bandit who actually did the killing was Claude Cefalü, and the only effect that the testimony could have had on the jury, if it had any effect at all, would have been prejudicial to the" state and beneficial to the defense. The testimony of Dietrich on this particular point was contrary to the state’s contention and contrary to the proof in the case. The state proved so conclusively that Claude Cefalu was the black-hooded bandit that the testimony of Dietrich who sought to identify Cauche merely by a similarity of voice would not have affected the case, even if defendants’ objection had not been sustained and the jury instructed to disregard that part of Dietrich’s testimony. We, therefore, find no merit in defendants’ complaint.
 

 
 *431
 
 Defendants complain that the trial judge admitted in evidence over their objection an alleged oral confession by the defendant Cauche to Capt. John Grosch, chief of detectives. Defendants’ contention is that the alleged confession was admitted without the proper foundation being laid .therefor.
 

 The record shows that when. Cauche was first arrested at Lipnick’s garage, he was placed in a police automobile from which he escaped. That in the ensuing chase he drew something from his pocket and threw it under a pile of trash. Later, Cauche was rearrested at his home by officer Scanlon, to whom he stated, on the way to the precinct station, in answer to the question of what made him jump from the car when first arrested, that he had in his possession $485 in currency which Cefalu had given him at the garage. That he knew there had been a bank stick-up and he did not want to be arrested with the money on him. That he jumped out of the car and ran and as he turned he fell and when he got up he threw the money under some tin and went out the alleyway on Royal street.
 

 Chief of Detectives Grosch testified that he went to the neighborhood of Lipnick’s garage, where there was a crowd of people assembled; that in looking for Cauche some of the officers walked around the block while he and other officers went through the alley leading to the rear; that a photographer pointed out some money lying under a pile of trash (lumber); that he picked up the money, which amounted to $485, in the presence of the photographer and other officers, and turned it over to Capt. Smith at -the Fifth precinct station. The witness testified that subsequently he took ,Cauche from the Ninth precinct station to the office of the district attorney, where he was questioned as to the murders and robbery! That Cauche denied taking part in the robbery, but admitted when questioned about the money found under the pile of lumber, that he had thrown the money under the lumber, stating that he had received it from Claude Cefalu.
 

 Ugarte’s particular complaint concerning the alleged confession seems to be that as there was evidence tending to show that Cauche, Ugarte, and Cefalu resided in or frequented the same neighborhood and knew one another, and as possibly at the time Cauche was arrested he was with Cefalu and allegedly had some of the stolen money in his possession, the alleged confession was detrimental to his interest. No argument is submitted on the part of Dallao to support the objection of Cauche to the admission of the alleged confession.
 

 Defendants’ complaints are not well founded. The testimony discloses that the statements of Cauche did not constitute a confession. They constituted a denial of guilt coupled with an exculpatory statement.
 

 A confession is limited in its precise scope and meaning to the criminal act itself. It does not apply to acknowledgments of facts merely tending to establish guilt, since a damaging, fact may be admitted without any intention to confess guilt. There is a broad distinction between the mere admission of inculpatory facts and a confession of guilt. Where a person only admits certain facts from which the jury
 
 *433
 
 may or may not infer guilt, there is no confession. Marr’s Crim. Jurisprudence, Vol. 2, pp. 841, 842.
 

 Defendants complain of certain remarks made by the district attorney and the assistant district attorney in the course of their arguments to the jury.
 

 Defendant Cauche contends that the assistant district attorney unlawfully commented upon the fact that the defendants had not taken the stand, but his bill of exception merely contains a general statement to that effect. There is nothing in the bill which shows the language used by the assistant district attorney of which defendant complains.
 

 Similarly, defendants Dallao and Ugarte complain that certain remarks of the assistant district attorney constituted comments on the failure of the defendants to take the stand. These remarks as embodied in the bills of exception were: “Oliver said that he was there (at Dallao’s house) about a week before the 30th, has that been contradicted?” . “Oliver said this gun was found in Dallao’s home. Has that been contradicted?” “The guns in the sack used New Year’s Eve were found under the house, that is Oliver’s statement, and there is nothing to the contrary.”- “And not one word of Oliver’s testimony .is contradicted.” “And from the testimony of Oliver these three defendants are murderers.” “That these three defendants were murderers and were there with Oliver.” The remarks, however, were not made in sequence. They were made at various times during the two hours’ argument of the assistant district attorney. The trial judge overruled defendants’ objections, holding that the remarks under the facts constituted legitimate argument on the part of the state, and also to sustain the credibility of its witness Oliver.
 

 Defendant Ugarte further objected to the following remarks of the district attorney, viz.: “The poor body (of deceased) torn asunder by the cruel bullets of these murderers, these human tigers,” and, “If you free them, you might as well go to Audubon Park and open up all the cages and let the snakes loose.” The state contends that the remarks were provoked by the argument of defendants’ counsel, urging the jury to return a verdict of not guilty, stating that they should do so — that they should turn them loose. Although the trial judge was of the opinion that the remarks of the district attorney were warranted by the evidence, he sustained defendant’s objection and instructed the jury to disregard the remarks.
 

 District attorneys may argue their cases with the same latitude as counsel for the defense. State v. Genna, 163 La. 701, 112 So. 655; State v. Graziani, 168 La. 297, 121 So. 872.
 

 It is legitimate to argue from the evidence that the crime is “cold blooded murder,” or that the only possible verdict is guilty of murder, State v. Gallo, 115 La. 746, 39 So. 1001; State v. Jackson, 142 La. 636, 77 So. 484; State v. McAdams, 149 La. 779, 90 So. 170; State v. Plorton, 151 La. 683, 92 So. 298; State v. Holbrook, 153 La. 1025, 97 So. 27; State v. Lewis, 156 La. 985, 101 So. 386; or that the defendant was a “monster,” State v. Spurling, 115 La. 789, 40 So. 167; State v.
 
 *435
 
 Morgan, 145 La. 585, 82 So. 711. And for the district attorney to say to the jury “whether banditry will continue is a question for you” is unobjectionable. State v. Graziani, 168 La. 297, 121 So. 872, 874.
 

 The comment that no witness for the defense has denied this evidence does not amount to a comment on defendant’s failure to testify. State v. Varnado, 126 La. 732, 52 So. 1006; State v. Robertson, 133 La. 806, 63 So. 363; State v. Connor, 142 La. 631, 77 So. 482; State v. Lewis, 156 La. 985, 101 So. 386; State v. Glauson, 165 La. 270, 115 So. 484.
 

 The complaint that there is no evidence of the whereabouts of accused on the night of the robbery is not a comment upon the failure of the defendant to testify. State v. Jack, 139 La. 885, 72 So. 429.
 

 Defendant Dallao complains that the trial judge overruled his objection when the district attorney stated to the jury in his argument that he wanted to read some facts from the case of State v. Taylor, 173 La. 1010, 1038, 139 So. 463, and to explain the law as laid down there as applicable to the facts. It appears, however, from the per curiam that, although defendants’ objection was overruled, the district attorney did not read any of the facts in the Taylor Case, but confined himself to reading therefrom only abstract principles of law as being the law from the standpoint of the state applicable to the case on trial. Hence, conceding that the trial judge erred in his ruling, no injury was suffered by defendant by reason thereof.
 

 We find no merit in defendants’ complaints.
 

 Another complaint of the defendant Ugarte to the argument of the district attorney is that he referred to Paul Serpas and Lloyd Seruntine, called as alibi witnesses for Ugarte, as having criminal records and also as being- linked up with Eddie Villarubia and Sam Mason, who are jointly charged with Joseph Oliver with the murder of Holland Hutchinson.
 

 The testimony showed that Serpas had been arrested twice, once in connection with a bank robbery and once for bootlegging, and that Seruntine had also been arrested several times. The names of Eddie Villarubia and Sam Mason were first brought into the record on cross-examination of the state’s witness by counsel for Dallao, who brought out the fact that Villarubia, Mason, and Oliver were under a charge of murder in connection with the death of Holland Hutchinson.
 

 In connection with this complaint, defendant Ugarte further complains of alleged prejudicial questions propounded to Seruntine and Serpas in regard to the character‘of two witnesses, Pat Gillan and Leonard Dazet, which questions disclosed that Gillan was in the penitentiary on a narcotic charge and that Dazet had been in the penitentiary on a narcotic charge.
 

 Seruntine had testified that he saw Joseph Ugarte about 8 o’clock on the night of December 30, 1930, at the corner of Dumaine street and Hagan avenue. He stated that he knew Oliver, who sometimes came to the same corner and that Ugarte “bummed around” there, but that he did-
 
 *437
 
 not know Cefalu. When asked who else 'was on that corner that night, he answered .Leonard Dazet and Pat Gillan.
 

 Dazet, who was summoned by Ugarte as :an alibi witness, answered when his name was called, hut was not placed on the stand. Vijlarubia and Gillan were not listed among the witnesses for the trial of this case, but their names were included in the list of witnesses furnished by Ugarte in 1931, ■when he was originally charged with the tsame crime.
 

 As we have hereinabove stated, the names ■of Eddie Villarubia, Sam Mason, and Willie Dupont were first brought into the record ■ on the cross-examination of the state’s witness Joseph Oliver by counsel for Dallao, -obviously for the purpose of affecting his ■ credibility by showing that Oliver and the ■other parties named were charged with the murder of Holland Hutchinson.
 

 Defendant Ugarte complains of the overruling of his objection to the state’s witness Joseph Oliver testifying to his having been in jail at the same time and for the same crime for which the defendants were •on trial. But we do not understand that Oliver so testified. On objection of defendant’s counsel that the records were the best evidence, they were produced and showed that Cauche, Ugarte, Kavanaugh, and the two Dallaos were in prison at the same time in the month of January, 1931. The bill does not show that Oliver answered the question. But the record shows that there were no arrest cards on file connecting Oliver with the robbery of the bank. Oliver’s testimony was to the effect that he had been arrested twice in the month of January, 1931, as being a dangerous and suspicious character and as having no visible means of support. We do not find any merit in defendant’s complaint.
 

 Defendant Ugarte complains that the trial judge refused to permit the introduction in evidence of two certain poll tax certificates testified to by one Clement Borreo, one of defendant’s witnesses. Defendant sought to introduce the certificates for the purpose of showing that a conversation took place between Borreo and one Weisdorfer, another alibi witness for defendant, in order to fix December 30, 1930, as the time when Weisdorfer saw a person he thought was Ugarte standing at the corner of Dumaine and Rendon streets or at Dumaine street and Hagan avenue. The trial judge stated in his per curiam that the poll tax receipts were not in existence at the time of the crime and were not in existence on the night preceding the crime, and that they had no relevancy whatsoever. Defendant’s complaint, therefore, is untenable. ’
 

 It is vigorously argued in the brief submitted on behalf of the defendant Ugarte that the evidence adduced on the trial of the case was not sufficient to warrant his conviction. But that is a matter which this court is powerless to review. Whether the evidence was sufficient to justify the conviction is a matter exclusively within the province of -the jury to determine.
 

 The defendant Cauche complains of the ruling of the trial judge refusing him oyer and inspection of statements, reports, confessions, and documents alleged to be in the possession of the police department. We find no error in the ruling. So
 
 *439
 
 far as the documents called for were public in character, defendant was not entitled to their inspection until they had been used in open court. Section 5 of Act No. 242 of 1912, as amended by Act No. 255 of 1920, § 3. And so far as they were of a private nature, defendant was not entitled to their inspection until they were offered in evidence. State v. Lee, 173 La. 966, 139 So. 302.
 

 As shown by the per curiam, whenever during the progress of the trial a request was made by any of the counsel representing defendants for an inspection of the documents and records in the possession of the district attorney, the request was promptly complied with and the documents and records submitted to them for their perusal and examination.
 

 The defendant Dallao was indicted as a principal with his codefendants. He contends that while he may have aided and abetted in the commission of the crime, he was not a principal, but an accessory before the fact. His contention is predicated on the recitals of the- bill of particulars furnished on his motion by the district attorney, and the legal question presented is raised by way of a motion to quash, requests for special charges, and objections to the general charge.
 

 The bill of particulars furnished by the state set forth that the defendant Dallao was at his combined place of business and home at 451 St. Mary street at the time of the robbery and murder. And, as shown by the per curiam, the court took cognizance of the fact that 451 St. Mary street is approximately 2% or 3 miles from the corner of Piety and Dauphine streets, where the bank was robbed. Because he did not accompany the other conspirators to the scene of the crime at the time of its commission, but remained at his home and place of business, defendant Dallao sought to make himself out an accessory and not a principal. But the allegations of the bill of particulars are not confined to the statement of Dallao’s absence from the scene of the robbery and murder. The allegations of the bill showing Dallao’s connection with the crime are as follows, viz.:
 

 “That all of the defendants, namely: Joseph Oliver, Owen Cauche, Joseph Ugarte and Anthony Dallao, are charged as principals with the murder of Pierre Rizan, which is alleged to have occurred on December 31st., 1930, Pierre Rizan being at the time of the murder the watchman of the Branch Bank of the Whitney National Bank of this city, situated at the corner of Dauphine and Piety streets. That the killing occurred in the daytime between the hours of 10 and 12 o’clock, in the branch bank hereinabove referred to. The murder grew out of a conspiracy entered into by and between Joseph Ugarte, Owen Cauche, Claude Cefalu, James Kavanaugh, Joseph Oliver, George Dallao and Anthony Dallao, to rob the said branch bank of the Whitney National Bank of United States-currency.
 

 “The names of James Kavanaugh, George Dallao and Claude Cefalu are not incorporated in this indictment, because:—
 

 “James Kavanaugh was heretofore tried and convicted on the 19th. day of February, 1932, of the murder of Pierre Rizan
 
 *441
 
 (sic) and was sentenced to life imprisonment in the State Penitentiary.
 

 “On July 11th., 1936, he was brought to this jurisdiction to be used as a state witness in the trial of this case, was temporarily confined in the Seventh Precinct Police Station of this city, where he committed suicide by hanging himself.
 

 “George Dallao was tried in the city of Gretna and convicted subsequently to the commission of the above named crime for the murder of one ‘Rabito,’ he and one ‘Ca-pad’ were convicted in that jurisdiction, sentenced to -death, and were hanged in the Gretna jail.
 

 ■ “Claude Cefalu was killed by police officers about two hours after the commission of the crime hereinabove referred to as he attempted to escape when the police officers had him under arrest.
 

 “That on the night preceding the robbery- Anthony Dallao drove the conspirators, Owen Cauche, Claude Cefalu, James Kavanaugh, Joseph Ugarte and Joseph Oliver down to the said branch bank in order to inspect the neighborhood and to point out the bank to be robbed. For this purpose Anthony Dallao used his own automobile.
 

 “In furtherance, of this conspiracy, and in order to carry out this unlawful enterprise, an automobile was stolen by the conspirators and thereafter used by them to drive to the said branch bank to carry out their unlawful design and was also used by them to make their escape. Likewise, in furtherance of said conspiracy, slickers or raincoats, together with hoods with eye holes cut in them, or glasses fitted in them, the said hoods being worn by these conspirators over their heads to hide their identity, the eye holes in said hoods being placed there in order to enable them, to see, and the slickers or raincoats being worn to hide the identity of their clothing, together with certain pistols and an automatic shotgun, were furnished the conspirators by George Dallao and Anthony Dallao, their co-conspirators, at their place of business located at No. 541 St. Mary street, for the purpose of the aforesaid robbery.
 

 “That on the day of the robbery and murders these conspirators armed themselves with the aforesaid weapons and equipped themselves with the aforesaid slickers or raincoats and hoods, together with cotton bags, or pillow slips, which were likewise furnished by the said co-conspirators George and Anthony Dallao, into which they intended to place, and did place, the money stolen from the bank, entered the stolen automobile previously referred to and drove to the branch bank of the Whitney National Bank at the corner of Dauphine and Piety streets. That all of the aforesaid conspirators with the exception of Anthony Dallao, entered the automobile and drove to the branch bank above referred to. Anthony Dallao remained at the premises No. 541 St. Mary street until after the robbery of the bank and the murders committed by these conspirators.
 

 “Arriving at the bank the conspirators got out of the automobile, entered the bank, and shot and killed Pierre Rizan and Gilbert Dietrich. They also shot Charles
 
 *443
 
 Dietrich in the hand and Alfred Brownson in the lungs and stomach from which the latter two persons recovered.
 

 “On the return of the conspirators the said Anthony Dallao opened the door of the garage at the premises No. 541 St. Mary street, to enable the automobile with the said conspirators to enter the garage, and then closed the door. Thereafter, the said Anthony Dallao hid the pistols and the shotgun under the house and participated in a division of the money stolen from the bank.”
 

 As shown by the per curiam, the evidence adduced on the trial of the case fully sustained the allegations of the bill of particulars. It established the facts as we have set them forth in the beginning of this opinion. The case against the defendant Dallao is not one in which he was guilty merely of aiding, advising, or abetting others to commit the crime, but is one in which he as the leading conspirator was actually a participator in the crime.
 

 Where one, as the defendant Dallao did, in his own home forms a conspiracy with others to rob a bank in the daytime and on the night preceding the day of the robbery drives his fellow conspirators in his own automobile to view the bank intended to be robbed, to reconnoiter the neighborhood, and instructs the other conspirators how and where'to park the automobile during the robbery; who thereafter returns to his home with the other conspirators, furnishes an automatic sawed-off shotgun, four revolvers, slickers, raincoats, and hoods to be worn by the conspirators in order to conceal their identity; then leaves his home and steals an automobile to be used by the conspirators in the-holdup of the bank the next day, which automobile he parks in his own garage so* as to be ready for the holdup; who furnishes sleeping accommodations for the conspirators in his own home for that night; who furnishes them drinks and coffee the-next morning; who puts the automatic sawed-off shotgun and revolvers in a sack and places them and the hoods, slickers,, and raincoats in the stolen automobile; who-opens the door of his own garage in order that the stolen automobile loaded with the-other conspirators can back the machine out into the street on their way to the-bank to be robbed; who then closes the garage door and remains in his home pending the robbery of the bank in the commission of which two persons are killed and two others wounded by the bandits using the weapons furnished by him; who, within less than an hour after the departure of the automobile, again opens the door of his garage to admit the automobile loaded with these same conspirators on their return from the robbery and murders; assists, in removing the guns and raincoats from the automobile; conceals the weapons on his own premises and then goes upstairs in his own home to divide the spoils, receiving an equal share thereof; he is a principal and not an accessory, notwithstanding he was not in the bank at the time it was-robbed and the murders committed. He is. a principal to the same extent as if he were physically present at the time and actually committed the murders.
 

 At no time did the defendant Dallaoabandon the unlawful enterprise. On the-
 
 *445
 
 contrary, from the time he drove the bandits to make a survey of the neighborhood and pointed out to them the bank to be robbed, he did everything in his power to further the conspiracy. The transaction was a continuous one from the time the conspiracy was formed unitl the time its object was accomplished. The conspiracy was not merely to commit robbery, but it was also to commit murder, if necessary, to effect the robbery or to secure the escape of the robbers. The Bandits entered upon the perpetration of the robbery armed with pistols and an automatic shotgun. They were prepared to kill if opposed, and they did kill two persons and wound two others when opposed. The defendant furnished the weapons with which the killing and wounding was done. Therefore, he not only shared with his coconspirators in the intent and act of robbery, but also in the intent and act of murder as one of the natural, ordinary, and probable consequences of the robbery.
 

 If the unlawful act agreed to be done is dangerous or homicidal in its character or if its accomplishment will necessarily or probably require the use of force and violence which may result in the taking of human life unlawfully, every party to such agreement will be held criminally liable for whatever one of the coconspirators may do in furtherance of the common design, whether he is present or not. State v. Taylor, 173 La. 1010, 1040, 139 So. 463. See State v. Terrell, 175 La. 758, 144 So. 488, to the same effect.
 

 In the Terrell Case, this court, in upholding the refusal of the trial judge to give the requested charge on accessories because it was not pertinent to the facts, stated, at page 796 of 175 La., page 499 of 144 So.: “There was no occasion for the court to charge on accessories, meaning accessories before the fact, to which the special charge on accessories is devoted. * * * The takers of this bill are eithcr guilty, because of their responsibility as members of the conspiracy, or they are not guilty, either as principals or accessories. To have given the charge on accessories could have served only to confuse the jury.”
 

 With certain unessential variations rendered necessary by the facts, the trial judge flelivered the same charge as to the general law of conspiracy as set forth with approval in the Taylor and Terrell Cases, and which was also approved in the later cases of State v. Capad, 179 La. 462, 154 So. 419, and State v. Daleo, 179 La. 516, 154 So. 437.
 

 Counsel for the defendant Dallao argues that the trial judge committed an error in so charging, because it was admitted by the district attorney and by the trial judge himself, and shown by the evidence, that Dallao was an accessory and not a principal. And that the trial judge further erred in charging that in a conspiracy all the conspirators ’ are principals, and that there could be, consequently, no accessory. State v. La Rocca, 168 La. 204, 121 So. 744; State v. Rodosta, 173 La. 623, 138 So. 124; State v. Campbell, 173 La. 831, 138 So. 853, are cited in support of the arguments.
 

 But counsel is mistaken in'his statement that it was admitted and proved that Dallao
 
 *447
 
 was an accessory and not a principal. At no time was such admission made either by the district attorney or by the trial judge. The defendant Dallao was charged as a principal, tried as a principal, and shown by the evidence to be a principal. Counsel is also mistaken in his statement the trial judge charged that in a conspiracy there could be no accessory. The charge of the trial judge on the general law of conspiracy was predicated on the facts as brought out on the trial of the case, showing that the defendant Dallao was a principal. As stated in the Terrell Case: “To have given the charge on accessories could have served only to confuse the jury.”
 

 Counsel argues that the defendant Dallao was not actually or constructively present when the crime was committed, and, hence, could not be a principal. If he were not actually present, we think he was constructively present. Counsel’s argument overlooks the facts as established by' the record. They show that the defendant Dallao was the organizer and master mind of the conspiracy, which was formed in his home. He furnished his home as a base of operations for the conspirators — as a place for them to leave from and to return to. He supplied the automobile to convey the bandits to the bank and to use in making their escape after the murders and robbery. He provided the loaded weapons with which to stage the robbery and commit the murders; the slickers and raincoats to be worn by the robbers to conceal their identities; and the pillow slip in which to place the money after it was stolen from the bank. In his own car, he drove the bandits to the scene of the crime the night before the robbery and murders, pointed out the bank to be robbed, surveyed the neighborhood, and instructed the conspirators where to park the bandit car in order to make certain their safe escape after the commission of the crime. Thereafter, he drove the conspirators to his home, which was the base of operations, where they slept that night and where the spoils were to be divided after the robbery and where they were divided, of which he got his share. From the time he drove them down to Piety and Dauphine streets and pointed out the bank to be robbed, until he opened the door of his garage to send them on their way to the bank, the conspirators were under the immediate observation and control of the defendant Dallao. He apparently saw to it that nothing was to be permitted to interfere with the deliberately and carefully laid plans of himself and his coconspirators to rob the bank and if need be murder any person who opposed the robbery or the escape of the robbers after the commission of the crime.
 

 The robbery and murders were committed in furtherance of the conspiracy formed by the defendant Dallao and his coconspirators. And although Dallao was not actually present, his coconspirators, who perpetrated the crime in furtherance of their conspiracy, were acting as his agents when they committed the unlawful acts. That is the doctrine of the Taylor and Terrell Cases, and we think it is applicable to the facts of this case.
 

 The cases cited on behalf of Dallao are not appropriate here. _ In State v. La Rocca, the facts showed that one Poretto was present and heard the three defendants conspire to rob the bank. He offered to furnish and
 
 *449
 
 drive the car for them, which he did. Poretto was indicated as an accessory before the fact, not as a principal. On the trial of the conspirators, the defendants objected to Poretto’s testimony as incompetent on the ground that he was admittedly an accessory and not a principal. In sustaining the action of the trial judge in admitting the testimony, this court referred to certain abstract propositions of law governing accessories and principals. The court pointed out that to be convicted as an accessory a person must be indicted as an accessory. It also pointed out that at. common law one indicted as principal cannot be convicted on proof showing him to be only an accessory before the fact. Legal propositions which no one can dispute.
 

 State v. Rodosta was referred to and differentiated from the .case presented there in State v. Terrell. The defendants in that case were not charged and prosecuted as conspirators. And the per curiam of the trial judge showed that there was evidence upon which to base a charge on accessories.
 

 In State v. Campbell, the conspiracy was formed to rob the bank at Greensburg, La., but the conspiracy was never carried out, because when the three bandits charged with the actual perpetration of the crime arrived in Greensburg they found the bank closed. Kent and Williams, the other conspirators, were stationed in an automobile at a point some miles from Greensburg and about 6 miles from Kentwood for the purpose of assisting in the escape of their coconspirators after they had robbed the bank at Greensburg. On finding the bank at Greens-burg closed, Ragan, one of the bandits, declared, “We have come down here to take a bank, By God, we will take the one at Kentwood.” Accordingly Ragan and the other bandits Campbell and Sandifer then drove to Kentwood and robbed the bank there. Kent and Williams contended that this robbery was committed without their knowledge and consent. They were indicted as principals. On the trial of the case they objected to the introduction of any evidence until it had been shown that they were present, acting together, aiding, and abetting in the commission of the crime. On the statement of counsel for the state that the testimony was for the purpose of proving that Kent and Williams were accessories before the fact, the trial judge overruled the objection on the authority of article 238 of the Code of Criminal Procedure making accessories before the fact principals. The codal article was held to be unconstitutional in the Rodosta Case. In view of that fact and that there was some evidence in the record tending to show that these particular defendants were nothing more than accessories, either before or after the fact, this court held that the testimony was only admissible for that purpose and not for the purpose of showing they were principals and that they were entitled to have the judge so charge the jury. In these circumstances, the case has no pertinency here.
 

 The complaint of the defendant Dallao is not tenable. We do not find that the trial judge erred in overruling the motion to quash and the objections to the general charge and in refusing to give the requested special charges.
 

 Defendants, in their motions for a new trial, which were overruled, complain of the alleged separation and misconduct of the
 
 *451
 
 jury on Sunday afternoon, July 26, 1936. We gather from the per curiam that the incident giving rise to defendants’ complaint occurred as follows, viz.:
 

 The jury was impaneled on Wednesday and. the trial was concluded the following Tuesday, so that a Sunday intervened. The trial judge instructed the deputy sheriffs in charge of the jury to engage a sightseeing bus to take them for a ride on this Sunday. The foreman of the jury, Mr. G. R. Westfeldt, who lives at No. 2340 Prytania street, informed the trial judge that his family was out of the city, and asked for permission to stop at his home during the course of the ride. The trial judge granted the permission, and, as a matter of precaution, instructed one of the deputy sheriffs that if alcoholic drinks were offered, to permit no juror to drink more than two. When the bus arrived at the home of Mr. Westerfeldt, which was some time in the afternoon, all the jurors keeping together went to a screened porch in the rear portion of the house, where they remained until they left the premises. There was a colored porter on the premises, who served refreshments, consisting of highballs, bottled beer, Coca-Cola, and ice water. Some of the jurors took highballs, some beer, some Coca-Cola, and some only ice water. No juror took more than two highballs or two bottles of beer. The jurors did not leave the screened porch during their stay on the premises. One or two of them did go to the toilet, which is located at a distance of about 15 feet from the larger portion of the porch. The deputy sheriff accompanied one juror to the bathroom, but there is a possibility that another juror went to the bathroom unaccompanied. As the jurors were leaving, the premises, several of them went into the bathroom and the other jurors waited for them outside the door. One juror also used an extension telephone in the presence of the other eleven jurors and the three deputy sheriffs in charge, and held a brief conversation with his wife.
 

 The rule of our jurisprudence is that the separation of the jurors must be such a separation as will be supposed to have some effect on the verdict. Such temporary or necessary separation as may be reasonably anticipated, or must necessarily occur in the course of a protracted trial, is not sufficient ground to vitiate the verdict. And it would be pushing technicalities too far to say that the verdict should be set aside when there is no reasonable room for any reasonable hypothesis of misconduct. Marr’s Crim. Jurisprudence (2d. Ed.) Vol. I, p. 707, § 466.
 

 The circumstances on which defendants’ complaint is based do not show that the jurors were so separated or were guilty of any misconduct as to affect the legality of their verdict. At the time they occurred the case had been on trial for five days and three nights. Neither the case for the state nor the case for the defendants had been closed. The arguments of counsel had not been made and the charge of the .trial judge had not been delivered. Tfye case was not submitted to the jury for deliberation and verdict until a lapse of almost forty-eight hours thereafter. The jurors while in Mr. Westfeldt’s home had no communication with outsiders, except in the case of 'the juror who held a brief conversation
 
 *453
 
 with-his wife over the telephone from which no prejudice to the defendants resulted.
 

 The trial judge describes the jury who tried this case as being composed of twelve of the finest citizens in the community. He states that the jurors demeaned themselves with the utmost propriety throughout the trial. They were patient and tolerant at all times and they gave the state and the defendants as fair and as impartial trial as it was possible for any accused person to secure.
 

 There is nothing in the circumstances we have described which could reasonably have prejudiced the defendants or which could necessarily afford any reasonable hypothesis of misconduct on the part of the jury.
 

 There are other complaints of the defendants embodied in bills of exception which have been either expressly abandoned or impliedly waived, since no argument is submitted in support of their recitals.
 

 Article 557 of the Code of Criminal Procedure provides: “No judgment shall be set aside, or a new trial granted by any appellate court of this State, in any criminal case, on the grounds of misdirection of the jury or the improper admission or rejection of evidence, or as to error of any matter of pleading or procedure, unless in the opinion of the court to which application is made, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, is prejudicial to the substantial rights of the accused, or constitutes a substantial violation of a constitutional or statutory right.”
 

 Our examination of the record has not disclosed any prejudicial or reversible error.
 

 For the reasons assigned, the convictions and sentences appealed from are affirmed.
 

 O’NIELL, C. J., is of the opinion that, ac-' cording to the decision rendered in State v. Rudosta, 173 La. 623, 138 So. 124, and the decision rendered in State v. Campbell, 173 La. 831, 138 So. 853, Anthony Dallao should have been indicted as an accessory before the fact. In other respects, the Chief Justice concurs in the decree rendered in this case.